# United States Court of Appeals for the Federal Circuit

---

**LAGUNA CONSTRUCTION COMPANY, INC.,**
*Appellant*

**v.**

**ASHTON CARTER, SECRETARY OF DEFENSE,**
*Appellee*

---

2015-1291

---

Appeal from the Armed Services Board of Contract Appeals in No. 58324, Administrative Judge Jack Delman, Administrative Judge Mark N. Stempler, Administrative Judge Richard Shackleford.

---

Decided: July 15, 2016

---

CAROLYN CALLAWAY, Carolyn Callaway PC, Albuquerque, NM, argued for appellant.

DOMENIQUE GRACE KIRCHNER, Civil Division, Commercial Litigation Branch, United States Department of Justice, argued for appellee. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., BRYANT G. SNEE.

---

Before PROST, *Chief Judge,* TARANTO and HUGHES, *Circuit Judges.*

HUGHES, *Circuit Judge.*

Laguna Construction Company was awarded a government contract in 2003 to perform work in Iraq. After the work was completed, Laguna sought reimbursement of past costs, a portion of which the government refused to pay. Laguna sued the government for these costs at the Armed Services Board of Contract Appeals. The government alleged that it was not liable because Laguna had committed a prior material breach by accepting subcontractor kickbacks, thereby excusing the government's nonperformance. The Board granted the government's motion for summary judgment on this ground, and declined to consider the merits of Laguna's motion. Because we agree that Laguna committed the first material breach by violating the contract's Allowable Cost and Payment clause, we affirm.

I

In November 2003, the government awarded Contract No. FA8903-04-D-8690, one of twenty-seven contracts for Worldwide Environmental Remediation and Construction (WERC), to Laguna Construction Company, Inc. (Laguna). The contract is governed by the Contract Disputes Act (CDA), and incorporates by reference certain Federal Acquisition Regulation (FAR) contract clauses. Under the contract, Laguna received sixteen cost-reimbursable task orders to perform work in Iraq, and awarded subcontracts to a number of subcontractors. The physical work under the contract was completed by 2010. The issue on appeal concerns the government's failure to pay fourteen vouchers that Laguna submitted in 2011 for taxes owed to Pueblo of Laguna and other incurred costs, including $24,000 of subcontract charges.

In February 2009, the Defense Contract Audit Agency (DCAA) began an audit of Laguna's incurred costs for fiscal year 2006.  In 2011, the DCAA disapproved approximately $17.8 million of subcontract costs due to insufficient support proving that the government paid a fair and reasonable price for the services subcontracted.  In April 2012, the DCAA rejected a portion of these costs, which comprised the fourteen Laguna vouchers at issue, totaling $3,031,925.  Laguna submitted a claim on the rejected vouchers for $2,874,081.  Laguna properly submitted a notice of appeal to the Armed Services Board of Contract Appeals (Board) after the Administrative Contracting Officer did not issue a decision.

Meanwhile, in January 2008, the government had begun investigating allegations that Laguna's employees were engaged in kickback schemes with its subcontractors.  In October 2010, Laguna's project manager, Ismael Salinas, pleaded guilty to conspiracy to pay or receive kickbacks in violation of 18 U.S.C. § 371, to conspiracy to defraud the United States, and to violations of 41 U.S.C. § 53, the Anti-Kickback Act.  Mr. Salinas admitted that from April 2005 to March 2008, he worked with subcontractors to submit inflated invoices to Laguna for reimbursement by the government, and profited from the difference.  Additionally, in February 2012, a federal grand jury in the District of New Mexico issued a criminal indictment against three principal officers of Laguna— Neal D. Kasper, Bradley G. Christiansen, and Tiffany White—alleging that they received kickbacks for awarding subcontracts.  The United States Attorney for the District of New Mexico filed a separate criminal information against Mr. Christiansen, the Executive Vice President and Chief Operating Officer of Laguna, for conspiring to defraud the United States by participating in a kickback scheme from December 2004 to February 2009.  On July 2, 2013, Mr. Christiansen pleaded guilty to the indictment.

After Mr. Christiansen's guilty plea, the government moved to amend its answer in the Board appeal to include the affirmative defense of fraud. The Board granted the government's motion to amend over Laguna's objection. *Appeal of Laguna Constr. Co., Inc.*, ASBCA No. 58324, 13 BCA ¶ 35,464. In the government's amended answer, the government alleged that it "is not liable for LCC's claim . . . because of LCC's breach of Contract No. FA8903-04-D-8690 when its principal officers and employees solicited and accepted kickbacks for awarding subcontracts under task orders issued under that contract, which constituted fraud against the United States." *Id.*

Laguna filed a motion for summary judgment, arguing that the government is not authorized to withhold funds where it has accepted the subcontractor prices as reasonable during contract performance and that any claims are barred by the statute of limitations. Laguna also alleged that the government had improperly imposed a monetary penalty for alleged deficiencies in Laguna's files. The government filed a cross-motion for summary judgment, arguing that Laguna's claim should be denied because Laguna committed the first material breach of contract by the fraud of its employees.

The Board agreed with the government and declined to consider the merits of Laguna's motion. The Board held that the "well settled principle of antecedent breach" is articulated in *Christopher Village, L.P. v. United States*, 360 F.3d 1319, 1334 (Fed. Cir. 2004), and that Laguna "committed the first material breach under this contract, which provided the government with a legal excuse for not paying [Laguna's] invoices." J.A. 13. The Board concluded that Laguna breached the duty of good faith and fair dealing because its employees' criminal acts in engaging in a kickback scheme were imputed to Laguna. The Board also found that Laguna breached the Allowable Cost and Payment clause in the contract because its vouchers were improperly inflated to include the payment

of kickbacks.  *Id.*  The Allowable Cost and Payment clause, incorporated as FAR 52.216-7, states that a cost is allowable only when it is reasonable and complies with the terms of the contract.

The Board found that the breaches were material because kickbacks are fraudulent.  *Id.* at 14.  Further, "[t]hat the government has not proven that kickbacks were paid under every TO [task order] or under every voucher does not render the fraud any less material." *Id.* (citing *Joseph Morton Co., Inc. v. United States*, 757 F.2d 1273, 1278 (Fed. Cir. 1985)).

Laguna appeals the Board's decision, arguing that the Board did not have jurisdiction over the government's affirmative defense of fraud, and in the alternative, that the Board erred in granting the government's summary judgment motion.  We have jurisdiction under 28 U.S.C. § 1295(a).

## II

We review the Board's legal conclusions without deference, and must accept findings of fact unless they are fraudulent, arbitrary or capricious, so grossly erroneous as to necessarily imply bad faith, or not supported by substantial evidence.  *Ryste & Ricas, Inc. v. Harvey*, 477 F.3d 1337, 1340 (Fed. Cir. 2007).

Initially, we must determine whether the Board had jurisdiction over the government's affirmative defense of fraud.  We hold that the Board properly exercised its jurisdiction.

"The Armed Services Board has jurisdiction to decide any appeal from a decision of a contracting officer of the Department of Defense, the Department of the Army, the Department of the Navy, the Department of the Air Force, or the National Aeronautics and Space Administration relative to a contract made by that department or agency."  41 U.S.C. § 7105(e)(1)(A).  Certain fraud-related

claims are outside of the Board's jurisdiction. *Martin J. Simko Constr., Inc. v. United States*, 852 F.2d 540, 545–48 (Fed. Cir. 1988). These include claims relating to 41 U.S.C. § 7103 (formerly 41 U.S.C. § 604), 28 U.S.C. § 2514 (Special Plea in Fraud), and 31 U.S.C. §§ 3729–31 (False Claims Act). *Id.* The government's affirmative defense of prior material breach does not fall into any of these categories.

Laguna argues that the Board does not have jurisdiction because the government's affirmative defense of fraud is a "claim" that requires "a decision of a contracting officer." Appellant's Br. at 17. A "claim" is "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." *H.L. Smith, Inc. v. Dalton*, 49 F.3d 1563, 1565 (Fed. Cir. 1995) (citing 48 C.F.R. § 33.201 (1994)). At oral argument, Laguna asserted that the government is seeking a reduction in the amount owed, which is a monetary award, or alternatively, a change in contract terms. Oral Argument at 1:10–1:50 http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20 15-1291.mp3. We disagree. Unlike our prior cases, the government's defense plainly does not seek the payment of money or the adjustment or interpretation of contract terms. *See Raytheon Co. v. United States*, 747 F.3d 1341, 1353 (Fed. Cir. 2014) ("In general, an equitable adjustment is a fair price adjustment designed to account for a change in the contract."); *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1331 (Fed. Cir. 2010) (finding no jurisdiction where the contractor had failed to submit a claim to modify the contract time). Such an interpretation would unnecessarily expand the definition of a "claim" and could improperly bar the Board's jurisdiction where the government raises *any* affirmative defense.

Further, in cases such as this, where the Board does not have jurisdiction over the underlying fraud actions—here an Anti-Kickback Act claim—the Board has determined that it can maintain jurisdiction over a separate affirmative defense involving that fraud as long as it does not have to make factual determinations of the underlying fraud. *See, e.g.*, *Appeals of AAA Eng'g & Drafting, Inc.*, ASBCA No. 48729, 01-1 BCA ¶ 31,256 (finding jurisdiction where the government alleged fraud in contract administration, and the Tenth Circuit had already determined that AAA had committed fraud); *Turner Constr. Co. v. Gen. Servs. Admin.*, GSBCA No. 15502, 05-2 BCA ¶ 33,118 (holding that the Board did not have jurisdiction over the government's affirmative defense of prior breach because the Board would have to find fraudulent conduct).

Here, the Board did not have to make any factual findings of fraud because it relied on Mr. Christiansen's July 2013 criminal conviction. And, the government's defense is not a "claim" that requires a decision by the contracting officer. Therefore, the Board properly exercised jurisdiction over the government's affirmative defense.

## III

We review the Board's grant of summary judgment without deference. *Ryste*, 477 F.3d at 1340. "Summary judgment is appropriate when the record, when examined in a light most favorable to the non-movant, indicates that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks and citation omitted).

Prior material breach is a federal common law defense asserted when a party breaches a contract after another party has already breached the same contract. *Christopher Village*, 360 F.3d at 1334. We have held that it can bar a contractor's breach claim against the govern-

ment, even if the government's later-occurring breach happened without knowledge of the first breach. *See id.* In *Christopher Village*, as a result of a criminal investigation, a plea agreement was entered establishing that the contractor was involved in a fraudulent insurance scheme that resulted in false claims for rent being submitted to the government. *Id.* at 1325. Based on that admitted fraudulent conduct, the Court of Federal Claims granted summary judgment to the government, finding that Christopher Village had committed a prior material breach that excused the government's alleged subsequent breach. *Id.* at 1326.

We affirmed, holding that when "a party to a contract . . . is sued for its breach [it] may ordinarily defend on the ground that there existed, at the time [of the breach], a legal excuse for nonperformance." *Id.* at 1334 (citing *Coll. Point Boat Corp. v. United States*, 267 U.S. 12, 15 (1925)); *see also Joseph Morton*, 757 F.2d at 1279; *K&R Eng'g Co., Inc. v. United States*, 616 F.2d 469, 475 (Ct. Cl. 1980). We found that Christopher Village had materially breached the contract by submitting false data and was under common control with the guilty affiliated company. 360 F.3d at 1334–36. Therefore, its prior breach excused the government's subsequent breach. *Id.* at 1336.

Laguna attempts to distinguish *Christopher Village* by arguing that it did not involve a CDA contract and that the CDA displaces the common law prior material breach rule. Nothing in the CDA suggests that Congress intended to displace this federal common law defense, nor is there any sound reason to do so.

The purpose of the CDA was to streamline the procedural aspects of government contract disputes, not to displace existing government defenses and remedies. Congress enacted the CDA to "provide[] a fair, balanced, and comprehensive statutory system of legal and admin-

istrative remedies." S. REP. NO. 95-1118, at 1 (1978). It clarified how the contract dispute process should work. *Id.* at 4; *see also id.* at 35 ("S. 3178 will put into statute the process by which Government contract claims are handled."); H.R. REP. NO. 95-1556, at 33 (1978) ("The bill provides for a statutory basis for the settlement of contract disputes in lieu of the present system primarily governed by standard contract provisions. . . . It does not provide for any new specific programs."). This goal was achieved primarily through enhancing contractors' access to courts and clarifying the powers of agency boards of contract appeals. S. REP. NO. 95-1118, at 11–13.

While the CDA was intended to be comprehensive, it did not foreclose the applicability of established precedent. For example, Congress noted that "to a large degree this bill provides for a statutory restatement of current practice and procedure" as a "large body of precedent has been established over the years to the extent that the rules are now well understood." H.R. REP. NO. 95-1556, at 13. Further, Congress made clear that certain aspects of contract disputes are not explicitly included in the CDA where there is well-established precedent. *See* 124 CONG. REC. 36261–68 at 36267 (1978) (explanation of amendments) ("Executive agency compromise and settlement authority is not addressed in this Act as this is a matter considered to be included in their [contracting officers or Agency Boards] existing procurement/acquisition authority under the established precedents."); S. REP. NO. 95-1118, at 19 (stating that the CDA is not intended to change various existing procedures).

Moreover, in an analogous case, we already have permitted the government to rely on a fraud-based affirmative defense in a contract governed by the CDA. In *J.E.T.S., Inc. v. United States*, the government entered

into a CDA contract[1] with J.E.T.S., Inc., requiring
J.E.T.S. to provide food service management on an air
base. 838 F.2d 1196, 1197 (Fed. Cir. 1988). After J.E.T.S.
sought an equitable adjustment for the second and third
years of the contract, employees of its parent company
were indicted for conspiracy to defraud the government
for falsely certifying that it was a small business. *Id.* at
1199. Prior to obtaining the contract, J.E.T.S. itself had
improperly certified that it was a small business. *Id.* at
1198. After the Eleventh Circuit affirmed the convictions,
the government moved for summary judgment. The
Board granted the government's motion, finding that "the
bad faith of [J.E.T.S] in securing the award made the
award voidable, if not void." *Id.* at 1199. We affirmed,
finding that because the contract was "procured by and
therefore permeated with fraud," J.E.T.S. was not entitled
to an equitable adjustment. *Id.* at 1200.

Because J.E.T.S. had falsely certified that it was a
small business, the government was excused from its
purported subsequent breach of extending the contract at
the same price as the first year, and therefore J.E.T.S.'s
claim for an equitable adjustment was voided. This was
the case even where J.E.T.S.'s fraudulent act was discov-

---

[1]     Although the decision on its face does not indicate
that the case was governed by the CDA, the record makes
clear that it was. The contract was awarded on April 1,
1980, after the CDA's effective date of March 1, 1979. *See*
Pub. L. 95-563 at Sec. 16. Moreover, the parties in their
respective briefing both indicated that the CDA applied.
*See* Brief for Appellee at 3, *J.E.T.S., Inc. v. United States*,
No. 87-1269 (Fed. Cir. Sept. 10, 1987); Reply Brief for
Appellant at 1, *J.E.T.S., Inc. v. United States*, No. 87-1269
(Fed. Cir. Sept. 18, 1987).

ered after the government's purported subsequent breach because the fraudulent certification occurred beforehand.

Application of the prior material breach rule in CDA proceedings at the Board comports with the Supreme Court's instruction that the government must be able to "rid itself" of contracts that are "tainted" by fraud, including kickbacks and violations of conflict-of-interest statutes. *See United States v. Acme Process Equip. Co.*, 385 U.S. 138, 146 (1966); *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 563 (1961) ("As we have indicated, the primary purpose of the statute [precursor to 18 U.S.C. § 208(a), the conflict-of-interest statute] is to protect the public . . . . This protection can be fully accorded only if contracts which are tainted by a conflict of interest on the part of a government agent may be disaffirmed by the Government."). *Acme Process* noted that the Anti-Kickback Act clearly expresses a policy "decidedly hostile" to kickback schemes, which are "hurtful to the Government's procurement practices" and "rarely detectable," and supports a "public policy [that] requires that the United States be able to rid itself of a prime contract tainted by kickbacks." 385 U.S. at 143–47; *id.* at 144–45 ("[E]ven if the Government could isolate and recover the inflation attributable to the kickback, it would still be saddled with a subcontractor who, having obtained the job other than on merit, is perhaps entirely unreliable in other ways. This unreliability in turn undermines the security of the prime contractor's performance—a result which the public cannot tolerate, especially where, as here, important defense contracts are involved.").

Lastly, we do not find persuasive Laguna's invocation of the termination and Anti-Kickback clauses. These clauses provide alternatives to address Laguna's fraud, but, as we have concluded, they do not foreclose application of the common law defense of prior material breach. The government could have chosen to terminate the contract for default or sought remedies under the Anti-

Kickback Act, but it was not required to do so. Rather, as we held in *Christopher Village* and *J.E.T.S.*, the government may use the prior material breach doctrine to defeat a contractor's breach claim.

## IV

We agree with the Board's determination that Laguna committed the first material breach by violating the Allowable Cost and Payment clause, which states that a cost is allowable only when it is reasonable and complies with the terms of the contract. *See* FAR 52.216-07. Laguna clearly violated the clause, and breached the same contract that it seeks payment under. Laguna's project manager admitted that he "agreed with others to accept kickbacks from LCC subcontractors," and "would cause subcontractors to submit inflated invoices to LCC for presentment to the government, but to agree to accept lesser amounts than those specified in their subcontractor invoices so that contract funds were available to pay me kickbacks." J.A. 6. Laguna's vice president also admitted that he "improperly manipulated the contracting process in order to ensure that the subcontractors who paid us kickbacks were awarded subcontracts. . . . Through this process [we] circumvented the competitive bidding process required by the FAR and LCC's own policies and procedures, and I was able to direct subcontracts to companies that were willing to pay us kickbacks." J.A. 8. The Board properly determined that these criminal acts constituted material breach that may be imputed to Laguna, since both employees were operating under the contract and within the scope of their employment when they "manipulated the contracting process." J.A. 13.

The fourteen vouchers at issue in this appeal, which total nearly $2.87 million, also include subcontract charges and taxes relating to past task orders. Therefore, these fourteen vouchers were inflated by Laguna's employees' fraudulent acts of accepting kickbacks, and constitute

violations of the Allowable Cost and Payment clause that governs the contract as a whole. Based on the facts of this case, Laguna's employees' criminal acts constitute a first material breach of its contract with the government.

Laguna argues that any alleged breach is not material because the government may audit and reconcile costs, thereby "assur[ing] that the Government will incur no damages." Appellant's Br. at 44. But this argument is foreclosed by *Acme Process*, which holds that government contracts tainted by kickbacks are hurtful because the government would be "saddled with" an unreliable subcontractor, which "undermines the security of the prime contractor's performance." 385 U.S. at 144–45. Further, as the government notes, there are resulting harms even if the government had audited and reconciled the inflated costs, such as losing the use of money it had overpaid to Laguna.

Laguna also contends that the government knew of the kickback scheme as early as January 2008, but continued to perform the contract until 2015, thereby waiving the prior material breach defense. This alleged "continued performance" included paying approximately $3.5 million in July 2012 for incurred costs and auditing Laguna's cost statements. Appellant's Br. at 26–27. In light of the facts of this case, we do not find these arguments persuasive.

A waiver is "an intentional relinquishment or abandonment of a known right." *Massie v. United States*, 166 F.3d 1184, 1190 n.** (Fed. Cir. 1999) (internal quotation marks and citation omitted). It was reasonable for the government to invoke the prior material breach rule after Mr. Christiansen entered a guilty plea in July 2013. Therefore, prior to this date, the government did not have a "known right" that would have invoked the prior material breach rule. In addition, after Laguna completed the physical work in 2010, the government's sole acts com-

prised conducting audits and making cost reimbursements. We disagree with Laguna's contention that it relied on these acts to its detriment by performing final accounting and audit tasks. It is clear that Laguna would have performed these tasks even if the government had terminated the contract. Therefore, the government did not waive its right to invoke the prior material breach rule.

Accordingly, we affirm the Board's grant of the government's summary judgment motion on the grounds that Laguna's prior material breach of the Allowable Cost and Payment clause excused the government's nonperformance.[2]

V

We have considered Laguna's remaining arguments and do not find them persuasive. Because the prior material breach rule applies, we find that the government's nonperformance was excused by Laguna's earlier violation of the Allowable Cost and Payment clause of Contract No. FA8903-04-D-8690.

**AFFIRMED**

---

[2] Because the Board properly granted the government's summary judgment motion, the Board was correct not to address the merits of Laguna's summary judgment motion.