ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Supply & Service Team GmbH | ) ASBCA No. 59630 |
| | ) |
| Under Contract No. W912PB-06-D-0011 | ) |

APPEARANCE FOR THE APPELLANT:      Paul D. Reinsdorf, Esq.
                                                                    Frankfurt/Main Germany

APPEARANCE FOR THE GOVERNMENT:      Raymond M. Saunders, Esq.
                                                                          Army Chief Trial Attorney
                                                                          CPT Jessica E. Hom, JA
                                                                          Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE PROUTY ON APPELLANT'S MOTION FOR SUMMARY JUDGMENT

Before the Board is the fully briefed motion for summary judgment filed by appellant, Supply & Service Team GmbH (SST). Because there are no material facts in dispute that preclude summary judgment, and appellant is entitled to judgment as a matter of law, we grant it.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

This appeal involves a contract (the contract) between the United States Army (Army) in Germany and SST[1] to provide role-playing actors (known as Civilians on the Battlefield (COBs)) for the purpose of helping to train soldiers for interactions with civilians on the battlefield (app. br., SUMF ¶¶ 1, 3).[2] At its inception, in June 2006, the contract required only German or English-speaking COBs, but, in late 2006, the Army decided that it would be helpful to obtain actors that spoke Arabic and other Middle-Eastern languages to assist in training its troops in an early-2007 exercise (SUMF ¶¶ 4, 14-15). On 2 March 2007, after the contracting officer (CO) had formally provided a change request to SST seeking pricing for the altered requirement, and after SST had submitted proposed pricing for the change, the Army issued Modification No. P00002 (Mod 2) to the contract modifying the contract in conformity with the change request and SST's proposed increased prices (SUMF ¶¶ 17-20). The same day, the Army issued Task Order 02 (TO 2) on the contract, requiring the

---

[1] Contract No. W912PB-06-D-0011 was initially awarded to Josip Fuduric und Bernd
      Specker but was later novated to SST.

[2] Where the government does not dispute SST's Statement of Undisputed Material
      Facts ("SUMF"), we cite it as fact.

provision of several hundred Arabic and Afghan language-speaking COBs for an exercise to begin on 6 March 2007 to last through 4 April 2007 (SUMF ¶ 19).

Two problems arose in contract performance after the Army issued the aforementioned modification and task order: first, SST encountered difficulty in obtaining enough COBs in Germany who spoke the newly-required languages; second, the process by which COBs received clearance from the Army to enter U.S. military installations in Germany was cumbersome, made even more so by the need to use so many COBs who were not necessarily native Germans. Many had to wait for several days before being informed that they would not be permitted on the base and more were turned away than ultimately permitted to participate. (SUMF ¶¶ 34-40) SST claimed that it needed to pay its potential COB participants for their time awaiting the Army's security screening, which was not contemplated by the contract's payment provisions (SUMF ¶ 44). SST also asserts that, at a meeting held on 21 March 2007, the CO agreed to compensate SST for the cost of paying potential COBs to wait for security checks (SUMF ¶ 49). The high rejection rate (for security reasons) of potential COBs who spoke Arabic and the Afghan languages caused SST to have difficulty obtaining enough such COBs for the exercises (SUMF ¶ 54). As a result, the CO agreed to SST's request that approximately one-third of the intended Arabic and Afghan-speaking COBs could be replaced by German speakers (SUMF ¶¶ 52-54).

The exercise using the COBs was duly held; SST provided the requisite number of COBs (with German speakers constituting 95 of the 277 role-players) (SUMF ¶ 53); and SST billed the Army (SUMF ¶ 62). The same day that SST billed the Army (5 April 2007), the parties executed a modification to TO 2 that slightly reduced the price (SUMF ¶ 63). After resolving a nonconsequential paperwork error, the Army approved the invoice and executed another modification to TO 2, Modification No. 03 (Mod 3), conforming its price to the amount in SST's invoice (SUMF ¶¶ 65-66, 71-72). In the invoice, SST billed the Army for its German-speaking COB substitutes at the same rate as those who were qualified to speak Arabic and the Afghan languages (SUMF ¶ 73).[3]

SST also submitted a request for equitable adjustment (REA) for the increased costs due to the delays in the Army's conducting its security screening for the COBs as well as the pay and lodging expenses for the rejected COBs (SUMF ¶¶ 75-78). Contemporaneously, SST submitted an invoice in the amount of € 88,763 for the REA (SUMF ¶ 79). In response, the Army issued Modification No. 04 (Mod 4) to TO 2 (SUMF ¶ 80; *see also* R4, tab 32). The precise terms of Mod 4 will be seen to be particularly important to the resolution of this appeal, so we reproduce them in large part below:

---

[3] The government disputes that it was on notice that SST was billing the German-speaking COB substitutes at the same rate as those qualified to speak Arabic or Afghan, but does not dispute that it was being billed for the two types of COBs at the same rate (gov't resp. at 6-7).

2

Block 10A. of the standard government form (SF 30) that was used to establish Mod 4 characterized it as a modification of contract order 0002 (R4, tab 32 at 1).

Block 14 of the SF 30, under the heading, "DESCRIPTION OF AMENDMENT/MODIFICATION" was filled in with the words: "Request for equitable adjustment" (R4, tab 32 at 1).

The second page of Mod 4 was the continuation page for Block 14. It began with a "SUMMARY OF CHANGES" that provided that "[t]he purpose of this modification is to settle contractor's demand by adding CLIN 9000 and to adjust the total amount of this order." (R4, tab 32 at 2) Contract line item number (CLIN) 9000 followed in the first numbered paragraph. It provided that the quantity of "SUPPLIES/SERVICES" was 1, with a unit price of € 88,763.00. (*Id.*) The text of CLIN 9000 that followed in this numbered paragraph stated:

> Settlement of FFP contractor's request for equitable adjustment for extra costs which occurred during the performance of Civilians on the Battlefield Role-Playing services performed under subject Task Order. Contractor's invoice No 03-04-2007, dated 19 April 2007 is attached hereto and made a part of this modification.

(*Id.*)

The next three numbered paragraphs of Mod 4 provided:

> 2. As a result of the foregoing the total cost of this contract was increased by Euro 88,763.00 from Euro 3,836,492.00 to Euro 3,925,255.00.
>
> 3. This modification finalizes all actions under this contract.
>
> 4. Contractor, by signing this modification you confirm that the contract is complete and the change to the contract amount as seen above constitutes the entire contract price for this order. Additionally, there are no further requests for equitable adjustments or claims to be submitted under this contract.

(*Id.*)

Both parties executed Mod 4 (*see* app. corr. dtd. 26 August 2016, ex. A), and the Army paid the invoice (R4, tab 32).

Enter, the Army Audit Agency (AAA). On 10 July 2007, the Army informed SST that the AAA was initiating an audit of the task order (SUMF ¶ 91). On 4 September 2007, the AAA submitted a memorandum to the Army concluding that SST had overbilled it on TO 2 (SUMF ¶ 93). The AAA issued its final report on 26 February 2008, concluding that SST had overbilled the Army by € 688,531 (SUMF ¶ 94). The bases supporting this finding of alleged overbilling were primarily that SST had not provided documentation supporting its costs for the potential COBs who were awaiting security processing and that SST had overbilled for the German-speaking COBs who were charged at the rate for Arabic and Afghan speakers (R4, tab 62 at 36-38).

On 31 October 2007, prior to receiving the final report from the AAA, the Army issued an unsigned contracting officer's final decision (COFD) demanding payment of € 688,531 (*see* SUMF ¶ 105). The basis for this decision was a memorandum from the AAA finding lack of support for the charges for COBs who were awaiting security processing and overcharging for COBs who were not Arabic speakers as well as a few other minor concerns (R4, tab 53).

By letter on 14 December 2007, the Army notified SST that it would collect the money by administrative offsets to three live task orders on the contract (SUMF ¶ 106). The Army in fact issued modifications (all dated 17 December 2007) to three live task orders to effect the threatened administrative offsets (SUMF ¶¶ 106-07), and SST executed at least two of those change orders at some point shortly thereafter (R4, tabs 57-58). On 14 January 2008, SST's counsel objected to the contracting officer's (CO's) payment demand, and, in response on 17 January 2008, the CO informed SST that it was reconsidering the payment demand and that such reconsideration would "toll" the 90-day appeal period (SUMF ¶¶ 110-11). More than five years later, on 29 October 2013, SST submitted a claim in the amount of € 643,242 to the CO for money taken by administrative offset (SUMF ¶ 116). No COFD followed, and SST filed this appeal to the Board on 17 October 2014 from the deemed denial of its claim.

## DECISION

The different counts of SST's complaint in this case essentially posit separate legal theories under which the Army's actions to recoup the alleged overpayments in this matter should have been precluded. This motion for summary judgment follows suit, providing multiple independent reasons why the Army should not have been able to challenge the payments after they were made. We need not resolve all of SST's contentions: as will be seen, the parties' execution of Mod 4, with its extremely broad statement (drafted by the Army) that it, "finalizes all actions under this contract," foreclosed future challenges to TO 2 costs by the Army. Because there has been no finding of fraud by an outside tribunal, (nor has the Army requested a stay of this case to investigate such allegations), we conclude that the Army has no basis to press its

4

affirmative defense of fraud, which was the only remaining impediment to judgment in favor of SST.

I.    The Standards for Summary Judgment

The standards for summary judgment before the Board are well established[4] and need little elaboration here. Summary judgment should be granted if it has been shown that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A non-movant seeking to defeat summary judgment by suggesting conflicting facts "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). Put another way, if the non-moving party carries the burden of proof at trial for elements of its case and fails to provide such proof in the motion for summary judgment, the moving party is entitled to summary judgment. *Dairyland Power Co-op v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994). We do not resolve controversies, weigh evidence, or make determinations of credibility. *Liberty Lobby*, 477 U.S. at 255. All reasonable inferences are drawn in favor of the non-movant. *Id.*

II.    Mod 4 to TO 2 Foreclosed Future Challenges by the Army to the Costs it Paid to SST on that Task Order

The parties' original arguments regarding Mod 4 generally viewed it under the construct of "accord and satisfaction" (*see, e.g.,* app. br. at 32-33; gov't opp'n at 7-9). We sought further briefing from the parties regarding whether Mod 4 could truly constitute an accord and satisfaction given that, at the time that Mod 4 was executed, there appeared to be little "*bona fide* dispute over appellant's entitlement to the equitable adjustment and/or payment for the non-Arabic speaking COBs," and there is Board precedent and other law indicating that such a pre-existing dispute is a prerequisite for the defense (*see* Bd. corr. ltr. dtd. 28 July 2016). Appellant did not respond directly to the question of whether a *bona fide* dispute was necessary to make accord and satisfaction, arguing that there was such a dispute by virtue of the REA (*see* Bd. corr. ltr. dtd. 22 August 2016 at 2). The government (while disputing the effect of Mod 4), argued that the law does not actually require a *bona fide* dispute (*see* Bd. corr. ltr. dtd. 22 August 2016 at 2-4).

Our survey of recent law regarding accord and satisfaction finds it to be generally cavalier in addressing the pre-existing dispute issue (*i.e.*, it goes without mention), although there is older law, never overruled, that makes such a dispute a requirement -- or at least a typical element -- of the defense. *See, e.g., Brock &*

---

[4] Board Rule 7(c)(2) provides that the Board looks to FED. R. CIV. P. 56 for guidance in deciding motions for summary judgment.

5

*Blevins Co. v. United States*, 343 F.2d 951, 955 (Ct. Cl. 1965) (quoting *Nevada Half Moon Mining Co. v. Combined Metals Reduction Co.*, 176 F.2d 73, 76 (10th Cir. 1949), for the notion that the "most common pattern" of the principle of accord and satisfaction included payment in "satisfaction of a claim or demand which is a bona fide dispute"); *Fleming v. Post*, 146 F.2d 441, 442 (2d Cir. 1944) (*bona fide* dispute a "prerequisite" for accord and satisfaction); *Wright Associates, Inc.*, ASBCA No. 33721, 87-3 BCA ¶ 20,056 at 101,535. The reason for the dispute requirement appears to be rooted in the need for consideration. *See, e.g., Browning v. Equitable Life Assurance Soc. of the United States*, 72 P.2d 1060, 1068 (Utah 1937); 6 CORBIN, CONTRACTS §§ 1276, 1279 (1962). After all, if one party were to simply reduce its obligations under the contract and the other received nothing in return, there would be no consideration to the short-changed party for having waived its contractual expectations.

In the end, we find that, whether Mod 4 was technically an accord and satisfaction or not, it was a bilateral contract modification, entered into by the parties with adequate consideration and with enough clarity to constitute a binding agreement.

First, there is the question, put into play by the government's response to our inquiry (but *not* in its opposition brief), of whether Mod 4 was ever signed by both parties (*see* Bd. corr. ltr. dtd. 22 August 2016 at 1-2). SST subsequently moved to supplement the Rule 4 file to include a version of Mod 4 that was signed[5] (*see* Bd. corr. ltr. dtd. 26 August 2016). The government then informed the Board that it did not object to the admission of the signed version of Mod 4, nor question its authenticity (*see* Bd. corr. ltr. dtd. 31 August 2016). Thus, it is agreed by all that Mod 4 was properly executed by both parties and the written terms of the modification are not in dispute.

Next, comes the question of the meaning of Mod 4 and whether it is ambiguous, precluding full judgment in SST's favor. The government argues in its opposition brief that Mod 4 is ambiguous because it is not clear whether its release language that, "[t]his modification finalizes all actions under this contract," (*see* R4, tab 32 at 2) was meant to apply to the REA, to TO 2, or to the entire contract (gov't resp. at 8-9). In its supplemental briefing, the government suggests that Mod 4 only applies to the REA (*see* Bd. corr. ltr. dtd. 22 August 2016 at 3). In fact, although the government's argument is superficially attractive, closer examination of Mod 4 allows us to divine the parties' intentions, which were to finalize all contract actions on TO 2.

We begin first with the law of contract interpretation. Under basic principles of the law, a contract is interpreted "in terms of the parties' intent, as revealed by language and circumstance." *United States v. Winstar Corp.*, 518 U.S. 839, 911 (1996)

---

[5] It is not clear why the government did not submit a signed copy of Mod 4 in the original Rule 4 file.

6

(citations omitted). Generally, this process begins and ends with the language of the contract. *TEG-Paradigm Environmental, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006). And in reviewing this language, the Board should read the contract "as a whole and [interpret it] to harmonize and give reasonable meaning to all its parts," if possible, leaving no words "useless, inexplicable, inoperative, insignificant, void, meaningless or superfluous." *Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,922; *see also Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002) ("contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract"); *Hunkin Conkey Constr. Co. v. United States*, 461 F.2d 1270 (Ct. Cl. 1972) (rejecting contract interpretation that would render a clause in the contract meaningless).

"A contract is ambiguous if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language." *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993) (citations omitted); *see also Optimization Consulting, Inc.*, ASBCA No. 58752, 15-1 BCA ¶ 36,106 at 176,275. Put another way, a contract provision is not ambiguous if it is may be reasonably interpreted in only one way.

With this law in mind, we turn to the language of the release in Mod 4. The government initially argues that the language could be read in any of three ways: waiver of all possible claims under the entirety of the contract; waiver of any claims under TO 2; or waiver of any claims on the REA (gov't resp. at 9). It subsequently modified its argument to assert that the best way to read the waiver to the extent it was valid, was that it dealt only with claims under the REA (*see* Bd. corr. ltr. dtd. 22 August 2016 at 2). Examining the three possible interpretations in turn, we see that the only plausible reading of the release language is that it applies to potential claims on TO 2.

First, neither party argues that the release language applies to all potential claims upon the entire contract. That is because, with performance remaining upon the contract at the time of the execution of Mod 4, including entirely new task orders, it would make no sense for the parties to agree that the amount of payment on the contract was frozen. Thus, "[t]his modification finalizes all actions under this contract," must either apply to TO 2 or to the REA.

On its face, it is clear that Mod 4 was issued in response to the REA. Indeed, it is quite specific in stating that its purpose was for "Settlement of FFP contractor's request for equitable adjustment." Furthermore, the amount of money paid was exactly the amount of the REA. But just because the purpose of the modification was settlement of the REA does not mean that it was limited to addressing that REA alone: the text of Mod 4, drafted by the Army, went far beyond that.

It is plain to us that the Army sought to obtain finality in its TO 2 pricing through Mod 4 and to foreclose any future changes, not just those associated with the

7

REA then before it. Paragraph 4 of the Block 14 continuation page included a statement to SST that, by executing Mod 4, it was "confirm[ing] that the contract is complete and the change to the contract amount as seen above constitutes the entire contract price for this order. Additionally, there are no further requests for equitable adjustments or claims to be submitted under this contract." Thus, the Army was not just settling the submitted REA, but obtaining a guarantee from SST that there were no further REAs to come on TO 2, and that the contract price was fixed with respect to TO 2. The third numbered paragraph, "finaliz[ing] all actions under this contract," thus applies to not just the REA, but to the entirety of TO 2. Support for this interpretation is buttressed by the fact that Mod 4 refers to TO 2 somewhat interchangeably with "the contract" (*see* R4, tab 32, Mod 4, Block 10A., *see also* Mod 4, Block 14 continuation, ¶ 2 (referring to "total cost of this contract," but plainly referring to the total cost of TO 2)).

Had SST come to the Army in the months after being paid upon its REA, seeking to file a new claim for work performed on TO 2, the Army would have been well within its rights to assert that SST had waived the ability to bring future claims. The obverse is true as well. Although the terms of paragraph 4 only applied to SST, the waiver in paragraph 3 was not so limited. The Army had agreed that all actions under TO 2 were final and, under the terms of Mod 4, waived its rights to make future challenges upon the money paid to SST.

It is relatively easy to demonstrate that Mod 4 was supported by adequate consideration. Consideration, a requirement for government contracts like all contracts, *see Franklin Fed. Sav. Bank v. United States*, 431 F.3d 1360, 1367 (Fed. Cir. 2005), is generally "a bargained for exchange consisting of an act, forbearance, or return promise." *Carter v. United States*, 102 Fed. Cl. 61, 66 (2011) (citing RESTATEMENT (SECOND) CONTRACTS §§ 71, 72 (1981)). In Mod 4, the government resolved the REA and foreclosed the possibility of any further claims upon TO 2 and, in return, SST received payment of its REA and reaped its own benefits of finality. That is the kind of exchange of value that constitutes consideration.

This is in contrast to Mod 2 to TO 5 (R4, tab 57) and Mod 3 to TO 6 (R4, tab 58), which the government contends constitute bilateral modifications providing the government entitlement to payment for the alleged overbilling on TO 2 (*see* Bd. corr. ltr. dtd. 22 August 2016 at 5-6). These bilateral modifications de-obligated funds on the contract to address the overbilling allegations, but neither constituted an agreement by SST that it had, in fact, overbilled the government, nor included any waiver language from SST. In the absence of something more, we decline to find that these modifications constitute agreement by SST that it overbilled the government or that it waived its contractual right to be paid for its work. *See Aircraft Armaments, Inc.*, ASBCA No. 9049, 1963 BCA ¶ 3934 (no mutual intent for release); *Stewart Avionics, Inc.*, ASBCA No. 10226, 65-2 BCA ¶ 5111; *King Construction Co.*, ASBCA No. 38303 *et al.*, 94-2 BCA ¶ 26,630; *see also Safe Haven Enterprises, Inc. v.*

8

*Department of State*, CBCA Nos. 3871, 3912, 16-1 BCA ¶ 36,444 at 177,628 ("[T]he amount of appropriated money that the agency affirmatively obligated to a firm-fixed-price contract (or takes away from it) [is], in many ways, irrelevant to the contractor...."). Moreover, SST received nothing from the government from its agreement to sign these de-obligation modifications, which means that that they lacked consideration and they could not be deemed to be binding upon SST in any event.

### III. The Army's Affirmative Defense of Fraud Cannot be Proved

The Army's affirmative defense is labelled as "Fraud," but it is a bit more subtle than that (gov't answer, part III). In essence, the Army argues that SST committed a material breach of the contract by submitting invoices for services not provided, to wit: overstating the hours worked by the COBs and by invoicing the German-speaking COBs at the Arabic-speaking rate (*id.*). This misrepresentation, the Army contends, constitutes fraud, and thus a breach of the duty of good faith and fair dealing (*id.*).

In our recent case of *Laguna Construction Co.*, ASBCA No. 58324, 14-1 BCA ¶ 35,748, *aff'd, Laguna Construction Co. v. Carter*, 828 F.3d 1364 (Fed. Cir. 2016), we held that a contractor's submission of invoices inflated by kickbacks constituted a violation of both the contractor's duty of good faith and fair dealing and the Allowable Costs and Payment clause. *Laguna*, 14-1 BCA ¶ 35,748 at 174,949. This contract breach (or breaches), as a prior material breach, excused the government from paying the invoices submitted by Laguna. *Id.* The Federal Circuit did not discuss the issue of good faith and fair dealing, but affirmed our decision, holding that a breach of the Allowable Costs and Payment clause excused the government from paying Laguna's invoices. 828 F.3d at 1372. Arguably, then, the facts alleged by the Army's counterclaim could fit within this defense.

But *Laguna* carries within it the reason that the Army cannot prevail here. As the Federal Circuit noted, although we do not possess jurisdiction over the fraud actions that may underlie an affirmative defense of fraud, we only "maintain jurisdiction over a separate affirmative defense involving that fraud as long as [we do not] have to make factual determinations of the underlying fraud." 828 F.3d at 1368-69 (citing *AAA Eng'g & Drafting, Inc.*, ASBCA No. 48729, 01-1 BCA ¶ 31,256). In *Laguna*, the underlying fraud was proved by the criminal convictions of the company's officers, relieving us of the need to make any fact finding on the matter. 828 F.3d at 1369; *see also Laguna*, 14-1 BCA ¶ 35,748 at 174,946-48.

Whether it remains consistent for us to be able to consider defenses based upon fraud, but not, in the first instance, their factual underpinnings is not a matter for review today because the government has declined to advance this argument. In the same correspondence in which we requested the parties' view of the need for a *bona fide* dispute in an accord and satisfaction, we sought their opinion about the Board's ability to make factual determinations of fraud. (*See* Bd. corr. ltr. dtd. 28 July 2016)

9

The government responded that it "does not argue" against the Federal Circuit's view of the limitations on our fraud fact-finding contained in *Laguna*, and generally "concedes that there is no third party finding of fraud for the purpose of applying the rationale in *Laguna*" (*see* Bd. corr. ltr. dtd. 22 August 2016 at 6).

We appreciate the government's candor, which makes clear that their *Laguna* defense cannot be sustained. To be sure, the government does not quite surrender its fraud defense: in the same correspondence, it argues that it is not seeking the same remedy as in *Laguna*, only seeking compensation for its overpayment (*see* Bd. corr. ltr. dtd. 22 August 2016 at 6-7), but this is a distinction without a difference. The decision in *Laguna* was based upon the fraudulent nature of the submitted invoices, not upon the scope of the remedy sought by the government. The government's further fallback in its 22 August correspondence is that it may still prevail under the audit clause without its affirmative defense of fraud (*id*. at 8). While that might have been so without Mod 4, it has no bearing upon the fraud defense, which we hold is unsustainable without third-party factual determinations.

## CONCLUSION

Mod 4, a valid bilateral contract modification, brought finality to the costs that would be submitted and paid upon TO 2, notwithstanding the AAA's subsequent challenge to those costs. The government's fraud defense is not viable due to lack of factual findings by outside tribunals. Accordingly, we sustain SST's appeal in its entirety.

Dated: 1 March 2017

J. REID PROUTY
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

10

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59630, Appeal of Supply & Service Team GmbH, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals