## ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of – )<br><br>Sand Point Services, LLC )<br><br>Under Contract No. NNG14WA50C ) | ASBCA Nos. 61819, 61820 |

APPEARANCES FOR THE APPELLANT:    Traeger Machetanz, Esq.
Nathan W. Rouse, Esq.
Davis Wright Tremaine LLP
Seattle, WA

APPEARANCES FOR THE GOVERNMENT:    Scott Barber, Esq.
NASA Chief Trial Attorney
David S. Schuman, Esq.
Trial Attorney
NASA Goddard Space Flight Center
Greenbelt, MD

## OPINION BY ADMINISTRATIVE JUDGE SWEET ON THE GOVERNMENT'S MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

These appeals involve disputes arising out of a contract between the National Aeronautics & Space Administration (NASA or government) and appellant Sand Point Services, LLC (SPS) to repair the Wallops Flight Facility's aircraft parking apron. SPS alleges that it incurred extra costs and encountered delays as a result of a differing site condition—namely unsuitable soil. It also alleges that NASA constructively changed the contract when it waived minor deviations from the contract specifications, and then insisted upon strict compliance with those specifications. Further, SPS alleges, that insistence upon strict compliance with the specifications resulted in economic waste.

NASA moves to dismiss, arguing that we lack jurisdiction because the contracting officer's (CO's) final decision (COFD) was based upon a suspicion of fraud. In the alternative, NASA moves for summary judgment, arguing that SPS admitted that its failure to comply with the contract was the fault of Atlantic Contracting and Material, Inc. (ACM)—SPS's subcontractor. Moreover, NASA argues that a bilateral modification released SPS's differing site condition claim.

For the reasons discussed below, we deny the motion to dismiss because the COFD was not based solely upon a suspicion of fraud, and we may resolve these appeals without making factual determinations of fraud. We also deny NASA's motion for summary judgment. SPS did not admit that the failure to comply with the specifications was ACM's fault, and that issue is not material to SPS's constructive change and waste

appeal. Further, there are genuine issues of material fact as to whether SPS signed the modification under duress.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

*I. The 50C Contract*

1. On September 8, 2014, NASA entered into Contract No. NNG14WA50C (50C Contract) with SPS to repair the Wallops Flight Facility's aircraft parking apron (R4, tab 1 at 1-2, 4, tab 3 at 3).

2. Under the 50C Contract, certain soils were unsatisfactory for this project (R4, tab 66 at 83). The 50C Contract required that SPS remove and replace unsatisfactory soils, as directed by the CO (*id.* at 84).

3. The 50C Contract also required SPS to obtain a bond (R4, tab 1 at 4).

*II. Performance*

4. On September 9, 2014, SPS obtained a bond from a surety (R4, tab 74, ex. 6).

5. On June 9, 2015, SPS sent NASA a Request for Information (RFI), which indicated that SPS had encountered unsuitable soil. The RFI presented two options to address the problem, and sought NASA's guidance. (R4, tab 66 at 86)

6. On June 11, 2015, and July 6, 2015, NASA sent SPS Requests for Proposals (RFPs) concerning soil removal (R4, tab 66 at 91, 140).

7. In response, SPS submitted a proposal on July 13, 2015, and revised proposals on July 21, 2015, and July 27, 2015 (R4, tab 66 at 144-70).

8. On August 12, 2015, NASA sent SPS a list of contract violations purportedly causing delays (R4, tab 18).

9. On August 20, 2015, NASA sent SPS a Show Cause Notice, stating that SPS failed to perform the 50C Contract within the required time, and requiring SPS to demonstrate why the contract should not be terminated for cause (R4, tab 19 at 1).

10. On August 28, 2015, SPS responded that it had failed to complete performance on time because NASA had not provided guidance on how to proceed in light of the purported differing site condition which was the subject of an RFI submitted on June 9, 2015 (R4, tab 22 at 2).

2

11. By letter dated September 4, 2015, NASA responded that a differing site condition did not cause the delays (supp. R4, tab 2 at 1).

12. After further exchanges, NASA wrote to SPS requesting that it execute Modification No. 000002. The letter stated that not signing Modification No. 000002 "will leave the Government no choice but to continue with termination for default proceedings." (R4, tab 25 at 1-2)

13. On September 16, 2015, SPS signed Modification No. 000002 (R4, tab 28 at 1). Modification No. 000002 changed the scope of the contract at no additional cost to NASA, and extended the completion date (*id.* at 2). Modification No. 000002 also contained the following release:

> In consideration of the modification agreed herein as complete equitable adjustment for the Contractor's proposal for adjustment dated June 19, 2015, July 27, 2015, and August 19, 2015 in response to [the RFPs]...and all claims related to this project; the Contractor hereby releases the Government from any and all liability under. this Contract for further equitable adjustments attributable to such facts or circumstances giving rise to the items described herein.

(*Id.* at 2-3)

14. On November 4, 2015, ACM notified NASA that it had completed major concrete paving operations, and requested a punch list (R4, tab 67 at 35).

15. On December 4, 2015, NASA provided a punch list. The punch list noted, *inter alia*, that the concrete texture and the mooring eyes did not meet the specifications. (R4, tab 67 at 40) NASA required completion of all punch list items within 45 calendar days. NASA also stated that final acceptance and payment were predicated upon successful punch list completion. (*Id.* at 37)

16. SPS requested variances from the concrete texture and mooring eyes specifications. NASA took the request regarding the concrete texture under advisement. Regarding the mooring eyes, NASA stated that the request would require an aircraft tie-down hook inspection. NASA further stated that "[i]f the mooring eyes are found to be good enough to be used in some fashion then only a credit will be needed for the improperly installed eyes." (R4, tab 67 at 278, supp. R4, tab 10)

17. On January 21, 2016, SPS sent NASA an email indicating that the mooring eyes had been hook tested, and NASA had accepted those results (R4, tab 67 at 107).

3

NASA responded that "[a]ll mooring eyes can be hooked. Mooring eyes are not installed within tolerance per plan." (*Id.* at 106)

18. On May 12, 2016, the CO sent SPS an email inquiring about the punch list status. In particular, the CO stated that "[i]t is immaterial if the mooring eyes can be used for tie-downs as they are tripping hazards and fail to meet the contract requirement of within a ¼ [inch] to flush with the surface." (R4, tab 67 at 404, Item No. 67) Regarding the concrete texture, the CO indicated that SPS either had to correct the surface, or provide a credit (*id.* at 401-02, Item Nos. 2, 19).

19. The parties exchanged multiple correspondence regarding punch list completion (R4, tab 67 at 411-588). SPS proposed addressing the mooring eyes with grinding, or the addition of plates (*id.* at 460-61, 471). SPS also insisted that the concrete texture was functional, even though it did not strictly comply with the specifications (*id.* at 438, 470).

*III. Miller Act Action*

20. On January 12, 2017, ACM filed an action in Federal District Court seeking compensation under the bond from SPS's surety due to SPS's failure to pay ACM pursuant to 40 U.S.C. Title 3131, *et seq* (Miller Act Action) (R4, tab 74, ex. 6). The Miller Act Action complaint alleged that "[u]pon information and belief, [SPS] has entered into an Agreement with NASA whereby [SPS] waived any right to recovery for the delays that were encountered by" ACM (*id.*; *see also* R4, tab 62 at 2 ¶ 8). ACM makes no allegation as to whether that release is enforceable, or whether SPS executed the release under duress (*id.*).

20. On February 27, 2017, SPS moved to intervene, and to dismiss or stay the Miller Act Action. SPS argued that the Miller Act Action was premature because ACM had not "completed its subcontract work to NASA's satisfaction." (R4, tab 74, ex. 7)

22. In support of the motion, Christopher Woodruff—SPS's General Manager—submitted a declaration (R4, tab 74, ex. 8, Woodruff decl.). Mr. Woodruff declared that ACM had not performed to NASA's satisfaction, stating that "ACM's subcontract work has not yet been completed, nor has ACM's subcontract work been accepted by NASA. To the contrary, NASA has rejected portions of ACM's subcontract work as nonconforming to the contract requirements." (*Id.* at 2) Likewise, Mr. Woodruff declared that "ACM has acknowledged the nonconformity of the ACM subcontract work rejected by NASA, and has agreed to correct the NASA rejected work" (*id.*). After discussing how SPS had submitted a Corrective Work Plan, Mr. Woodruff declared that "ACM has not fully and duly performed its subcontract work under the terms of the ACM subcontract" (*id.* at 4). Mr. Woodruff did not declare that the deficiencies were ACM's fault (*id.* at 2-4). On the contrary, Mr. Woodruff declared that there was a differing site condition that impacted time and costs (*id.* at 4).

4

*IV. Procedural History*

23. On October 27, 2017, SPS submitted a Request for Equitable Adjustment (REA), seeking compensation for the alleged differing site condition of unsuitable soil (R4, tab 66 at 1, 7-10).

24. On January 19, 2018, SPS submitted an REA seeking compensation for an alleged constructive change and economic waste regarding the punch list items (R4, tab 67).

25. By letters dated June 5, 2018, SPS notified the CO that it was converting its REAs into certified claims, and provided certifications (R4, tabs 69-70).

26. On September 19, 2018, the CO issued a COFD (R4, tab 74). First, the CO stated that SPS released the differing site condition claim in Modification No. 000002, and that a differing site condition did not cause increased costs or delays (*id.* at 1-2). Second, the CO rejected SPS's constructive change and waste claim on the grounds that pilot safety required compliance with the specifications, and the project was not functional (*id.* at 2-3). Finally, the CO stated that the claims appeared fraudulent because Mr. Woodruff admitted in the Miller Act Action that ACM failed to perform in accordance with the specifications (*id.* at 3-5).

27. There is no evidence that the CO referred the matter to the agency official responsible for investigating fraud.

28. SPS filed a notice of appeal and complaint, which we docketed as ASBCA No. 61819 (constructive change and waste appeal). In that appeal, SPS admits that the concrete texture and mooring eyes were deficient, but alleges that those deficiencies involved "minor issues" (compl. ¶ 69). Moreover, SPS alleges that NASA constructively changed the contract when it waived strict compliance with the specifications by accepting the concrete texture and the mooring eyes, but then insisted upon strict compliance with the specifications (*id.* at 57-66). SPS also alleges that insisting upon strict compliance with the specifications caused economic waste because the concrete texture and mooring eyes "did not fall within the specified tolerances under the contract but were otherwise fully functional" (*id.* at 17, 67-76).

29. SPS also filed a separate notice of appeal and complaint, which we docketed as ASBCA No. 61820 (differing site condition appeal). In that appeal, SPS concedes that there were delays, but alleges that those delays were due to NASA's failure to provide directions after SPS notified it of a differing site condition (compl. ¶¶ 34-43).

30. Discovery has not commenced yet.

## DECISION

*I. NASA's Motion to Dismiss*

We deny NASA's motion to dismiss because we possess jurisdiction over these appeals. A valid COFD is a prerequisite for Contract Disputes Act (CDA) jurisdiction, *PROTEC, GmbH*, ASBCA Nos. 61161, 61162, 61185, 18-1 BCA ¶ 37,010 at 180,244, and an agency does not have the authority to settle, compromise, pay, or otherwise adjust any claim involving fraud. 41 U.S.C. § 7103(c)(1). However, "[t]he Board does have jurisdiction under the CDA to decide the contract rights of the parties even when fraud has been alleged." *SIA Constr., Inc.*, ASBCA No. 57693, 14-1 BCA ¶ 35,762 at 174,984 (quoting *Pub. Warehousing Co. K.S.C.*, ASBCA No. 58078, 13 BCA ¶ 35,460 at 173,896). In particular, "[t]hat fraud allegedly may have been practiced in the drafting or submission of...[a] claim does not deprive this Board of jurisdiction under the CDA." *Nexus Constr. Co.*, ASBCA No. 51004, 98-1 BCA ¶ 29,375 at 146,017 (citing *Anlagen und-Sanierungstechnik GmbH*, ASBCA No. 37,878, 91-3 BCA ¶ 24,128 at 120,753). We possess jurisdiction when a COFD is not based solely upon a suspicion of fraud. *Daff v. United States*, 78 F.3d 1566, 1572 (Fed. Cir. 1996); *PROTEC*, 18-1 BCA ¶ 37,010 at 180,244. Moreover, we possess jurisdiction over an appeal if we do not have to make factual determinations of fraud. *Laguna Constr. Co., Inc. v. Carter*, 828 F.3d 1364, 1368-69 (Fed. Cir. 2016); *SIA Constr.*, 14-1 BCA ¶ 35,762 at 174,985.

Here, the CO's assertion that SPS's claims involve fraud is undermined by the fact that she did not refer the matter to the agency official responsible for investigating fraud (SOF ¶ 27), which she would have been obligated to do if she concluded that there was evidence of fraud. *PROTEC*, 18-1 BCA ¶ 37,010 at 180,244 (citing FAR 33.209). Further, the COFD is not based solely upon a suspicion of fraud (SOF ¶ 26).

In addition, we do not have to make factual determinations of fraud to resolve these appeals. We do not have to determine whether any incorrect statements were made knowingly and with the intent to deceive. *SIA Constr.*, 14-1 BCA ¶ 35,762 at 174,984 (quoting *Pub. Warehousing*, 13 BCA ¶ 35,460 at 173,896). Indeed, we need not even have to make a factual determination as to whether any statement in the claims were incorrect. The statements in the claims that the CO found were incorrect were those that purportedly were inconsistent with Mr. Woodruff's declaration that ACM failed to perform in accordance with the specifications. (SOF ¶ 26) For purposes of this appeal, SPS concedes that it and ACM did not perform in accordance with the specifications, (SOF ¶¶ 28-29). In particular, in its differing site condition appeal, SPS admits performance delays, but—consistent with Mr. Woodruff's declaration—asserts that those delays were due to a differing site condition (SOF ¶¶ 22, 29). Moreover, in its constructive change and waste appeal, SPS concedes that the concrete texture and mooring eyes did not meet the specifications, but asserts that those defects were minor, NASA waived strict compliance with those specifications, and enforcing those specifications would result in economic waste (SOF ¶ 28). Because we need not make

6

factual determinations of fraud to resolve those arguments, we possess jurisdiction over these appeals.

## II. NASA's Motion for Summary Judgment

### A. Standard of Review

Summary judgment is appropriate only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A material fact is one that may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). There is a "genuine" dispute as to such a fact if "the evidence is such that a reasonable [fact-finder] could return a verdict for the nonmoving party." *Id.*

### B. SPS Did Not Admit That Non-Performance Was its Fault

NASA is not entitled to judgment as a matter of law on SPS's claims on the grounds that Mr. Woodruff admitted that non-performance was ACM's fault (gov't mot. at 15-16). While Mr. Woodruff conceded that ACM did not perform in accordance with the specifications, he did not declare that that failure was ACM's fault (SOF ¶ 22). Regarding the differing site condition appeal in particular, Mr. Woodruff specifically declared that a differing site condition caused delays and increased costs (SOF ¶ 22). Therefore, Mr. Woodruff's declaration is consistent with the allegations in the differing site condition appeal. Regarding the constructive change and waste appeal, Mr. Woodruff did not admit that the deficient concrete texture and mooring eyes were ACM's fault (SOF ¶ 22). Even if he had, that admission would not dispose of the constructive change and waste appeal. That is because on appeal, SPS's argument is that, even if it was ACM's fault that the concrete texture and mooring eyes did not meet the specifications, NASA waived strict compliance with those specifications, and strict enforcement of those specifications would result in economic waste (SOF ¶ 28). Therefore, not only does Mr. Woodruff's declaration fail to establish a lack of a genuine dispute as to whether the concrete texture and mooring eyes defects were ACM's fault, that issue is not material to this appeal.[1]

### C. There Is a Genuine Issue of Material Fact as to Whether SPS Released its Differing Site Condition Claim

---

[1] NASA incorrectly argues that we should defer to the CO's fact findings (gov't mot. at 16; gov't reply br. at 1-2). Our "jurisdiction is *de novo* and the CO's findings are not subject to any presumption of correctness nor are they binding on appeal." *AeroVironment, Inc.*, ASBCA Nos. 58598, 58599, 16-1 BCA ¶ 36,337 at 177,178 (*citing Wilner v. United States*, 24 F.3d 1397, 1401-03 (Fed. Cir. 1994) (*en banc*)).

7

Nor is NASA entitled to judgment as a matter of law on the grounds that Modification No. 000002 released the differing site condition claim because there is a genuine issue of material fact as to whether SPS signed Modification No. 000002 under duress. A release is the product of duress—and therefore is not enforceable—when (1) a person compels another to assent to a release against his will; (2) such assent is induced by wrongfully threatening action the person has no legal right to take; and (3) the threatened action, if taken, will cause irreparable damage to the other person. *Enviro. Tectonics Corp.*, ASBCA No. 23374, 86-1 BCA ¶ 18,649 at 93,784. "It is not duress to threaten to make good faith use of the remedies prescribed under the contract." *Id.* at 93,782 (quoting *Johnson, Drake & Piper, Inc. v. United States*, 209 Ct. Cl. 313 (1976)). However, the government must have a good faith belief that it is entitled to take the threatened action. *Id.* at 93,782-83; *see also Urban Plumbing & Heating Co. v. United States*, 408 F.2d 382, 388-92 (Ct. Cl. 1969). Moreover, the government's actions—even if authorized by the contract—cannot violate notions of fair dealing. *Enviro. Tectonics*, 86-1 BCA ¶ 18,649 at 93,784-85.

Here, it is premature to decide the factual issue of whether NASA's threat to terminate the contract was made in good faith, or violated notions of fair dealing.[2] Resolution of those issues involve fact-intensive inquiries. *Id.* at 93,785. However, discovery has not even commenced in these appeals (SOF ¶ 30). Therefore, we deny NASA's motion for summary judgment. *See* FED. R. CIV. P. 56(d).[3]

## CONCLUSION

NASA's motion to dismiss and its motion for summary judgment are denied.

Date: August 5, 2019

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

---

[2] Likewise, it is premature to decide the factual issue of whether there was economic waste (gov't mot. at 22-26).

[3] NASA's assertion that ACM took the position in the Miller Act Action that Modification 000002 was binding is inaccurate (gov't reply br. at 6). While acknowledging that NASA signed a release, ACM made no allegation as to whether that release was enforceable, or whether SPS signed it under duress (SOF ¶ 20).

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61819, 61820, Appeals of Sand Point Services, LLC, rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

9