# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| ECC CENTCOM Constructors, LLC ) | ASBCA No. 60647 |
| ) | |
| Under Contract No. W912ER-11-D-0010 ) | |

APPEARANCES FOR THE APPELLANT:    Dirk D. Haire, Esq.
                                  Jessica Haire, Esq.
                                  P. Sean Milani-nia, Esq.
                                  Ronni Two, Esq.
                                    Fox Rothschild LLP
                                    Washington, DC

APPEARANCES FOR THE GOVERNMENT:   Michael P. Goodman, Esq.
                                    Engineer Chief Trial Attorney
                                  Daniel B. McConnell, Esq.
                                  Rebecca L. Bockmann, Esq.
                                  Sarah L. Hinkle, Esq.
                                    Engineer Trial Attorneys
                                    U.S. Army Engineer District, Middle East
                                    Winchester, VA

## OPINION BY ADMINISTRATIVE JUDGE O'CONNELL

This appeal arises from a contract to construct two buildings for the Navy in Manama, Bahrain. Appellant, ECC CENTCOM Constructors, LLC (ECC), challenges the contracting officer's termination of the contract for default. The Board conducted a hearing from 10-14 July 2017. We deny the appeal.

## FINDINGS OF FACT

### Project Background

1. On 16 June 2011, the U.S. Army Corps of Engineers (Corps or USACE) awarded ECC an indefinite-delivery/indefinite-quantity, multiple award task order contract (MATOC) through which the Corps could award firm-fixed-price task orders for design-build and construction projects in the U.S. Central Command area of responsibility. The MATOC had an estimated value of $1.52 billion. (R4, tab 11 at 1-2)

2. On 19 February 2013, ECC submitted a proposal for MATOC task order 6 (R4, tab 27). Budget constraints resulting from sequestration significantly delayed the

award, *see National Federation of Federal Employees, Local 1442 v. Department of the Army*, 810 F.3d 1272, 1275 n.1 (Fed. Cir. 2015), but ECC agreed to extend the validity of its offer until 17 September 2013 (R4, tabs 56-57, 238). The contracting officer awarded the contract to ECC on 11 September 2013 (R4, tab 28), but a bid protest delayed issuance of the notice to proceed until 2 January 2014 (R4, tab 62).

3. At award, the contract had a value of $40,301,215.55 and required ECC to design and build two structures (R4, tab 29 at 2-7). The first was a transient enlisted quarters that would provide housing for sailors and other government personnel for up to a few weeks; contracting officer's representative (COR) Greg Walgate described this structure as a simple barracks (tr. 1/47-48). The second structure, a dining facility for officers and enlisted personnel was, in Mr. Walgate's view, a more complicated structure (tr. 1/48; R4, tab 29 at 408).

4. The contract required completion of the work within 710 days of receipt of the notice to proceed, which resulted in an initial completion date of 13 December 2015 (R4, tab 29 at 14, tab 62 at 1). On 14 April 2016, the contracting officer issued Modification No. 20, which changed the completion date slightly to 16 December 2015, where it would remain through termination (R4, tab 49 at 2).

5. The contract contained various standard clauses including Federal Acquisition Regulation (FAR) 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) (R4, tab 11 at 14); and FAR 52.211-12, LIQUIDATED DAMAGES—CONSTRUCTION (SEP 2000) (R4, tab 29 at 14). The latter clause set liquidated damages at $2,397 per calendar day of delay.

Events Leading Up to Termination

A.   The Show Cause Notice and ECC's Response

6. On 12 December 2015 (one day before the initial completion date), contracting officer Peter DeMattei (CO DeMattei) notified ECC of his intent to assess liquidated damages for late completion (R4, tab 194).

7. On 30 December 2015, two weeks beyond the modified completion date, CO DeMattei issued a show cause letter, citing ECC's untimely performance (R4, tab 197). Among other things, he stated that ECC's most recent pay request (Progress Payment Request No. 14), approved on 22 November 2015, indicated that ECC had completed only 37 percent of the work. This pay request was for the month of September 2015 but was the most recent because ECC did not submit pay request No. 15 until 18 January 2016 (R4, tab 228). CO DeMattei had followed ECC's progress by reviewing daily reports and talking to USACE field personnel (tr. 3/37-38).

2

8. CO DeMattei further observed in the show cause letter that ECC's most recent schedule showed a completion date of 31 August 2016 (more than eight months late), but he expressed skepticism that ECC could achieve that date (R4, tab 197 at 2). He directed ECC in its show cause response to provide a schedule that was "realistic and acceptable" (*id.* at 3).

9. On 9 January 2016, ECC submitted a response to the show cause notice (R4, tab 198). ECC admitted that that the project was only 51.94% complete, but alleged that it had suffered, among other things, mobilization delays, weather delays, security gate delays, material shortages, and manpower shortages. ECC calculated that it had been delayed 262 days. (*Id.* at 1-3, 6) However, ECC did not state that its response was a claim or that it was seeking a final decision from the contracting officer, nor did it seek a sum certain. In fact, the letter suggested a claim would be forthcoming because for each alleged delay it listed the "No. of Days Direct Impact to be Claimed." (*Id.* at 6)

10. ECC attached to its show cause response a schedule that showed a 31 August 2016 completion date (R4, tab 198 at 21, 62). ECC subsequently submitted a schedule dated 31 January 2016 showing completion on 7 September 2016 (R4, tab 967 at 1, 35).

11. During the course of the project, ECC had a history of submitting schedules that it failed to meet (*see, e.g.,* R4, tabs 155, 661, 667, 673, 686, 707, 723 at 2). The most striking example of this involved two schedules submitted in 2015. Under a schedule recovery plan ECC submitted on 11 May 2015, ECC stated that it would complete the project by 17 April 2016, more than four months late (R4, tab 160 at 4). ECC did not make the progress detailed in this schedule. It subsequently submitted a 31 August 2015 schedule that changed the completion date to 31 August 2016 (R4, tab 759 at 16-17). Thus, in the 112 days between 11 May and 31 August 2015, ECC fell a further 136 days behind schedule.

12. Against this backdrop, on 17 February 2016, CO DeMattei met with ECC program director Keith Pushaw. CO DeMattei informed Mr. Pushaw that he did not consider the 7 September 2016 completion date to be realistic (tr. 2/188). ECC responded by submitting another schedule on 4 March 2016, referred to as T62I. This schedule further pushed the completion date back to 30 November 2016. (R4, tab 205 at 4)

13. At the end of February 2016, ECC calculated that it had completed 59 percent of the contract work (R4, tab 205 at 5, tab 230 at 1; ex. A-7 at 6). To complete the project in nine months as specified in the T62I schedule, ECC would have needed to average about 4.5 percent completion per month for the next nine months, with some months higher (and some months lower) than this average. Thus, the T62I

3

schedule projected completion of 5.19 percent in March and 5.94 percent in April 2016. (R4, tab 205 at 5)

14. CO DeMattei tasked a USACE scheduler, Ramon Sundquist, with reviewing the T62I schedule. Mr. Sundquist wrote a memo to CO DeMattei dated 16 March 2016 in which he provided his analysis (R4, tab 1032). Mr. Sundquist had some critical and some positive comments on the schedule. He stated:

> I don't like that so many changes have been made to original durations, this essentially destroys the as-built from baseline schedule, or at a minimum makes it very difficult to make comparisons of actual performance vs. originally intended. For this reason alone, I would not recommend that this schedule be approved.

(*Id.* at 2)

15. However, Mr. Sundquist also stated that:

> With Manpower loading, sub-contractor buy-in and suppliers being contracted for the most up to date delivery schedules, it appears to be projecting an end of project date that should be achievable, if the manpower remains at the needed level, and materials are delivered as planned. If this effort warrants a "one more chance" to the contractor's continuing toward finishing this project, I think this plan is one that can be monitored and tracked from the field perspective.

(R4, tab 1032 at 2)

16. Mr. Sundquist limited his review to the information presented in the schedule and he did not attempt to verify ECC's statements with respect to subcontractor "buy-in," manpower, or material deliveries (tr. 5/55-56). With respect to the likelihood that ECC would have met the 30 November 2016 completion date he testified that he considered it possible but not probable due to its history of failing to meet its schedules (tr. 5/59).

17. CO DeMattei reviewed Mr. Sundquist's analysis and met with him to discuss it. He concluded that the T62I schedule was not realistic because ECC did not have the proper type of manpower on site to complete the work per the schedule. He also based his conclusion on ECC's history of not meeting schedules during the

4

prior three years on this project and an adjacent project, referred to as the P937 project. (Tr. 2/238-39)

B.    The P937 Project Influences CO DeMattei's Decision-Making

18.    In January 2013 (one year prior to issuing the notice to proceed on task order 6), the Corps issued a notice to proceed to ECC for MATOC task order 2, a bachelor enlisted quarters, referred to as the "P937" project (R4, tab 1220). P937 was adjacent to the task order 6 project (tr. 1/47) and both were design-build projects that would provide living facilities for sailors and were similar in value and time to complete (R4, tab 1220; tr. 1/47). ECC used the same team of subcontractors on the two projects (R4, tab 27 at 7). CO DeMattei was the contracting officer on both contracts (R4, tab 1203).

19.    For more than a year, ECC made good progress on P937. In mid-2014 ECC's progress slowed considerably, which coincided with the completion of the 95% design and commencement of test piles on task order 6 (tr. 1/49-50; R4, tab 232 at 378, tab 1162 at 2, tab 1220). At the 20 January 2015 completion date for P937, ECC had completed about 61% of the work (R4, tab 1198), somewhat better than it would do on task order 6, but still far behind schedule.

20.    Fifteen months later, at the time CO DeMattei terminated task order 6 for default, ECC still had not finished the P937 work. In a pay estimate for the period ending 5 May 2016, ECC indicated that it had completed about 95% of P937. (R4, tab 1215)

21.    When ECC fell behind on P937, the Corps demanded that ECC submit recovery schedules, which ECC did, but it failed to meet them. As COR Walgate testified:

> [W]e had several recovery schedule[s] on 937 and that's when we said [sic] the plan progress going up and then the actual progress greatly diverging. We'd demand a recovery schedule. They'd say hey we're going to meet this, we're going to increase our manpower and we're going to meet the schedule.
>
> The next month we'd say you didn't increase your manpower and you didn't increase your placement and we're still falling behind. We need a new recovery

5

schedule because you're not following your current
recovery schedule.

(Tr. 1/122)

22. As of 26 May 2017, ECC had completed 98% of the P937 project (R4, tab 1220).

23. In its reply brief, ECC does not take issue with this P937 timeline, except to point out that the Corps received beneficial occupancy of the building on 29 September 2016 (R4, tab 1220), which was more than 20 months after the contract completion date.

C.     Termination of Task Order 6

24. ECC did not make the progress called for by the T62I schedule in March and April 2016. Instead of 5.19 percent in March, it completed 3 percent. Instead of 5.94 percent in April, it completed 2 percent through 19 April. (Ex. A-7 at 6) We find that ECC failed to diligently prosecute the work to ensure completion within the time specified in the contract.

25. CO DeMattei kept himself up to date on ECC's progress through the date of termination (tr. 3/12). He testified:

> And so you had March through April to witness
> what ECC stated in their recovery schedule they would
> actually perform, along with the placement that was
> required, and it was not met during that time period, just
> like the recovery schedule before that, the recovery
> schedule before that, the baseline, and any other schedule
> that was submitted.

(Tr. 3/52)

26. In his testimony, ECC's expert conceded that ECC lost time in March and April 2016 but only on non-critical activity. He opined that ECC would have made up the time "just based on float management." (Tr. 4/113) Based on ECC's history on this project, we find this to be unconvincing.

27. CO DeMattei considered the amount of time ECC needed to complete P937 and its inability to meet its schedules on that project as part of his analysis for the task order 6 termination (tr. 2/252, 3/45, 48, *see also* tr. 5/58-61).

28. CO DeMattei prepared a memorandum dated 12 April 2016 addressing the factors specified in FAR 49.402-3(f) for consideration before a default termination (tr. 2/244-56; R4, tab 1104). Among those factors, CO DeMattei analyzed the urgency of the government's need for the buildings and the time it would take for another contractor to complete the work. He stated that the government's need was "urgent." However, he concluded that the government could not rely on ECC's 30 November 2016 completion date due to its history of submitting unrealistic schedules and its financial condition. He stated that the government would be at less risk if it re-procured from "a capable source" than if it allowed ECC to continue. (R4, tab 1104 at 2)

29. The memorandum indicated that CO DeMattei intended to "resolicit" the work to ECC's subcontractor, Kooheji Contractors W.L.L. (R4, tab 1104 at 2). Both parties refer to Kooheji as the "super subcontractor" because it had performed all of the actual construction with ECC simply providing management (R4, tab 233; tr. 2/257; app. br. at 2)

30. CO DeMattei terminated the contract for default in a contracting officer's final decision dated 19 April 2016. In the "Analysis" section of the decision, he referred to "ECC's History of Submitting Unrealistic Schedules" and "ECC's Grave Financial Condition." (R4, tab 2 at 6-8) However, as for the actual ground for the termination, he stated "The Government considers ECC's failure to complete the work required under the Contract within 710 days specified for contract completion as grounds for termination under FAR 52.249-10" (*id.* at 9). CO DeMattei also stated that he had considered the excuses set forth in ECC's 9 January 2016 response to his show cause notice but had rejected them with the exception of the weather delay, for which he had issued Modification No. 20 adding three days to the completion date (*id.*).

31. CO DeMattei did not award the replacement contract to Kooheji. Rather, in response to a proposal by ECC's Surety, Fidelity and Deposit Company of Maryland (Fidelity or surety), USACE entered into a contract with Fidelity that identified The Vertex Companies, Inc. (Vertex), as the completion contractor (app. supp. R4, tab 29 at 3). Vertex specializes in taking over contracts for sureties and had successfully performed other projects within the district (tr. 2/257). The surety's proposal was attractive to the Corps because it promised to resolve ECC's disputes with Kooheji and the designer of record, Michael Baker, Inc. (companies which the Corps held in high regard) and retain them on the project (tr. 2/257-58).

32. CO DeMattei believed at the time that it would take two to four weeks to negotiate the takeover contract with Fidelity. The negotiations took longer than he expected (during which period Fidelity also negotiated with ECC's subcontractors)

7

and the Corps and Fidelity did not sign the takeover agreement until 19 July 2016, three months after the termination. (Tr. 3/82-84; app. supp. R4, tab 29 at 11)

33. The takeover agreement specified that Fidelity/Vertex would have until 15 August 2017 to complete the work (app. supp. R4, tab 29 at 6). Thus, the parties essentially concluded that, even with the incumbent super subcontractor and designer of record, nearly 13 months would be required to complete work for which ECC was contending at the time of termination it could finish in just over 7 months.

34. The Navy at some point decided to change the transient enlisted quarters building to a bachelor enlisted quarters, which contains more elaborate living facilities (tr. 3/75, *see also* tr. 1/47). The project had not been completed at the time of the hearing in July 2017 and it is not clear if Vertex was on schedule at the time of the hearing if pending modifications were considered (tr. 3/85).

35. The parties agree that ECC suffered extensive delays to its work. The government blames the delays entirely on ECC (*e.g.*, gov't br.[1] at 62-82). ECC accepts responsibility for a considerable amount of delay but contends that the government bears some responsibility as well. The government has presented to the Board almost a stupefying level of factual detail concerning ECC's work progress, but we will focus on the excusable delays presented by ECC's expert in the following table:

| Amended July 7, 2017 | | | | | |
|---|---|---|---|---|---|
| Time Period <br> Issue | Excusable (cd) | Non-Excusable (cd) | Period Total (cd) | Cum Total (cd) | Forecasted Completion Date |
| **Time Period 1: NTP thru Apr 30, 2015** <br> a.     (1) Late Mobilization of Proposed Personnel [Delay 1a] <br>        (2) ECC Mitigation – complete DP-1 [Delay 1b] | 59 <br><br> -25 | | | | |
| b.     (1) Extended Duration to install Test Piles and complete U/G Utility Demolition due to late responses by USACE [Delay 2.0] | 9 | | | | |
| c.     (2) Extended Duration to Place Building Pads [Delay 2a] <br>        Late Mobilization of Pile Crew [Delay 2b] | | 14 <br><br> 21 | | | |

---

[1] Citations to "gov't br." are to the government's revised opening brief dated 15 November 2017.

| | | | | | |
|---|---|---|---|---|---|
| d. Production Pile Extended Duration/ Second Crew Not Available [Delay 3] | 45 | | | | |
| e. Extended Duration to Install Grade Beams [Delay4] | | 12 | | | |
| f. Weather (included in Delay 3 above) [Mod 20] | | | | | |
| g. Added Activities from Previous Schedule Updates | | 65 | | | |
| **Sub-total** | **88** | **112** | **200** | **200** | **Jun 30, 2016 (1)** |
| Mitigation – Recovery Schedule No. 1 | | -74 | | | |
| **Sub-total** | **88** | **38** | **126** | **126** | **Apr 17, 2016** |
| **Time Period 2: Apr 30, 2015 thru Sep 1, 2015** Unavailable CMU | 59 | | | | |
| Superstructure Extended Division | | 77 | | | |
| **Sub-total** | **59** | **77** | **136** | **262** | **Aug 31, 2016** |
| **Project Sub-Total through Sep 1, 2015** | **147** | **115** | **262** | **262** | **Aug 31, 2016** |
| **Time Period 3: Sep 1, 2015 thru Feb 29, 2016** Extended Duration to Complete Work Mods 16, 17, 18 (2) | | 91 | | | |
| **Sub-total** | **147** | **206** | **91** | **353** | **Nov 30, 2016** |
| **Time Period 4: Feb 29, 2016 thru Apr 19, 2016** Mod 20 Issued | - | - | - | | |
| **Sub-total** | | | | **353** | **Nov 30, 2016** |
| **Project Total** | **147** | **206** | | **353** | |

(1) ECC's 25Mar15 Schedule Update forecasted a completion date of Jun 30, 2016 with the project's longest path going through completion of the DFAC. This longest path and the additional delay appear to result from ECC schedule revisions in its updates after USACE approved the baseline schedule and before ECC issued Recovery Schedule No. 1. ECC recovered delays in Recovery Schedule No. 1 which forecasted a completion date of Apr 17, 2016.
(2) Based on TDF's Time Impact Analyses. Mods 16, 17, 18 would extend the project by 71 cd and would be excusable.
(3) As a result of the one day difference between the original analysis and the current amended analysis, TDF adjusted the number of days added to ECC's schedules in item g.

(Ex. A-7 at 5)

Delays Alleged By ECC

A. Late Mobilization of Proposed Personnel (34 days)

36. ECC contends that it suffered 59 days of excusable delays due to the contracting officer's rejection of key personnel substitutions as well as slow

processing of visas by the Government of Bahrain. ECC's expert calculates that ECC mitigated 25 of the days for a net excusable delay of 34 days. (Finding 35)

37. The MATOC contained the following clause concerning, among other things, substitution of key personnel:

> 1.5 KEY PERSONNEL, SUBCONTRACTORS AND OUTSIDE ASSOCIATES OR CONSULTANTS
>
> In connection with this contract, any in-house personnel... will be limited to individuals...that were specifically identified in the Contractor's accepted proposal. The Contractor shall obtain the Contracting Officer's written consent before making any substitution for these designated in-house personnel.... If the Contractor proposes a substitution, it shall submit the same type of information that was submitted in the accepted proposal to the Contracting Officer for evaluation and approval. The level of qualifications and experience submitted in the accepted proposal or that required by the Solicitation, whichever is greater, is the minimum standard for any substitution.

(R4, tab 11 at 251)

38. The request for proposals (RFP) for task order 6 stated that the Corps would award the task order to the offeror whose proposal presented the best overall value to the government. The RFP identified four evaluation factors including Management Plan. (R4, tab 21 at 4-5)

39. The RFP specified the key personnel to be identified in the contractor's proposal, including the project manager, site superintendent, quality control system manager (QC Manager), and site safety and health officer (R4, tab 21 at 7). In evaluating the contractor's Management Plan, the RFP stated that more weight would be given to personnel with experience on at least three projects of similar size, scope and complexity and with at least ten years of experience related to the position he or she would hold on this project (*id.*). In its proposal, ECC identified the personnel who would perform these functions and included their resumes (R4, tab 27 at 8-10).

40. In awarding the contract to ECC, the Corps agreed to pay an additional $7 million to ECC compared to the low offeror based on ECC's "stellar key personnel qualifications" (tr. 2/183).

10

41. The task order incorporated ECC's proposal (R4, tab 29 at 12).

42. As stated above, more than ten months elapsed between the time ECC submitted its proposal and the notice to proceed due to the sequester and bid protest. During this time period, ECC did not inform the government that its key personnel had become unavailable.

43. During the initial months of the project, ECC proposed substitutions for its key personnel. The history of these proposals is so extensive that one virtually needs a scorecard to follow just the QC Manager replacements (*see* R4, tabs 63, 65, 67-68, 70, 73, 75-76, 106, 112, 120, 127, 147, 280-81, 284, 291, 295-97, 305, 322, 326, 398, 400, 407, 474). However, given our determination with respect to this issue, we do not believe it is necessary to make extensive findings of fact.

44. By letter dated 19 December 2014, ECC submitted a request for equitable adjustment (REA) for personnel mobilization delays (R4, tab 129). ECC contended that it had experienced 157 days of delay (mitigated to 126 days) as a result of the government's rejection of its proposed personnel, or untimely responses to the requests, and through delays in the processing of visas by the Bahraini government[2] (*id.* at 4). In addition, ECC requested additional costs in the amount of $113,812 (*id.* at 5).

45. ECC did not certify its REA; it did not state that it was submitting a claim under the Contract Disputes Act; nor did it ask for a final decision from the contracting officer.

46. On 16 December 2015, CO DeMattei denied the REA (R4, tab 195).

47. In its 9 January 2016 response to the show cause notice, ECC referred to this REA as a "claim," but also promised to submit another letter concerning that delay (R4, tab 198 at 1), and at least implied that it would be submitting a claim (*id.* at 6 (identifying "No. of days Direct Impact to be Claimed")). ECC then began preparing a claim requesting a contracting officer's final decision for 142 days of compensable

---

[2] According to the REA, ECC's visa problems arose from a restructuring of the Bahraini visa system (*see* R4, tab 147 at 3). ECC supplemented the REA with a statement from its visa processing firm that on 18 February 2014 the Bahraini government transitioned from a paper/manual entry system to a digital system (*id.* at 3, 14). The system was not completely shut down, however. Rather, according to the visa firm, the system "had limited application submissions on occasion basis to 0730 hrs -1230 hrs" from 18 February through June 2014 (*id.* at 14). It is not clear what this means and no witness from the visa firm testified at the hearing.

delay valued at over $200,000 (R4, tab 1073 at 1, 3, 18, tab 1081 at 1). ECC never submitted this claim.

B.    Late RFI Responses (9 Days of Delay)

48. The government deposed ECC's expert on 23 June 2017, 17 days before the hearing commenced (R4, tab 1170). As a result of questions posed at the deposition, ECC's expert subsequently added a new calculation that the government caused nine days of excusable delay due to late request for information (RFI) responses (finding 35). ECC's expert discussed them briefly during his testimony at the hearing (tr. 4/37-39). The RFIs at issue are Nos. 36, 37 and 42 (ex. A-7 at 26).

RFI 36

49. The Corps received RFI 36 from ECC on 20 May 2014 and responded on 17 June 2014 (R4, tab 1106 at 12). ECC's inquiry concerned an underground communications line within the transient quarters building; ECC asked that it be abandoned and replaced. The Corps responded by stating that it was a government communications line and that it would reroute them as soon as possible. (*Id.*)

50. The Corps subsequently requested a proposal for ECC to perform the work and on 4 November 2014 the parties entered into bilateral Modification No. 7. The modification increased the contract price by $27,873 but added no additional time. The modification included the following language:

> **8. Closing Statement:** In consideration of the modification agreed to herein as complete equitable adjustments for the items above, the Contractor hereby releases the Government from any and all liability under this modification for further equitable adjustments attributable to such facts or circumstances giving rise to this agreement. It is further understood and agreed that this modification is in full and final settlement of all outstanding claims and demands of any nature whatsoever in regard to the items listed above.

(R4, tab 36 at 4)

51. There is no evidence that ECC submitted a claim to the contracting officer at any time related to RFI 36 (tr. 1/129-31). ECC also failed to mention this RFI in its response to the show cause notice (R4, tab 198).

RFI 37

52. The Corps received RFI 37 on 20 May 2014. ECC's inquiry concerned a fire hydrant supply line that it had discovered and could not determine whether it was active or inactive. The Corps responded on 13 July 2014, stating the line was inactive and could be abandoned/demolished in accordance with the contract requirements. (R4, tab 1106 at 12-13)

53. The Corps' RFI response contained the following language indicating that the Corps believed its response was a no-cost clarification:

> We believe that the above response represents a "NO COST" clarification that does not require any adjustment to the existing terms of the contract. If you believe that the above response represents a change to the terms of the contract, you are hereby requested to immediately notify the Contracting Officer, in writing, prior to taking any action regarding the subject of this RFI response. If you do not provide a written notification within five (5) calendar days, indicating your position, and providing your request for an equitable contract adjustment associated with the above response, it will be assumed that you agree that this is a "NO COST" clarification and that an adjustment to the contract price and/or duration is not required; in which case, we will consider this matter closed.

(R4, tab 1106 at 13)

54. There is no evidence that ECC ever asked for more time in connection with RFI 37 (see tr. 1/131-34). ECC also failed to mention this RFI in its response to the show cause notice (R4, tab 198). We find that ECC failed to submit a claim seeking additional time to the contracting officer with respect to RFI 37.

RFI 42

55. The Corps received RFI 42 on 26 June 2014. The RFI concerned electrical lines and PVC conduits that were not energized but crossed the building site. The Corps responded on 8 July 2014 by directing ECC to remove them to the limits of the contract. The Corps included in the response the same language as in its response to RFI 37 that it considered its response to be a no-cost clarification. (R4, tab 1106 at 15)

13

56. There is no evidence that ECC ever sought additional time as a result of RFI 42 (*see* tr. 1/133-34). ECC also failed to mention this RFI in its response to the show cause notice (R4, tab 198). We find that ECC failed to submit a claim seeking additional time to the contracting officer with respect to RFI 42.

C.    Production Pile Extended Duration/Second Crew Not Available (45 Days)

57. In his report, ECC's expert contended that ECC suffered an additional 45 days of excusable delay due to the unavailability of Kooheji's second piling crew (ex. A-16 at 46). He stated that the second piling crew became unavailable due to the 34-day mobilization delay as well as a 43-day non-excusable delay to the start of the piling work (*id.* at 3, 45-46).

58. This issue is somewhat complicated by the changes ECC's expert made to his opinion after his deposition. In appellant's exhibit 7, the expert introduced his contention that ECC suffered 9 excusable delays due to late RFI responses, while also reducing the non-excusable delay to the start of piling work from 43 to 35 days (finding 35). While it might be logical to infer that the insertion of the RFI delay into this time period also affected the availability of the piling crew, ECC actually appears to have simplified its position. In its post-hearing brief, ECC attributes the unavailability of the second piling crew solely to the mobilization delay (app. br. at 15, 59).

59. In any event, neither party has directed us to any claim that ECC submitted seeking 45-days of excusable delay due to the lack of a second piling crew, nor have we discovered any in the record. In its response to the show cause notice, ECC made a general statement that it experienced a shortage of skilled manpower that impacted the project by "about 46 days" (R4, tab 198 at 2). It blamed the shortage on "the number of visas and eligibility requirements by local Bahraini policy" (*id.*). ECC expanded on this by stating that there was a limited pool of skilled labor in Bahrain and increasing labor required cooperation from the Bahrain government. It stated that from May to December 2015 it had increased craft labor from 216 to 480 workers. It also stated that it had added 40 electricians, incorporated more efficient mechanical, electrical and plumbing construction practices, as well as more efficient practices concerning conduit bending and insulating duct work (*id.* at 4). But ECC said nothing about piling crews.

60. We find that ECC failed to submit a claim for a time extension due to piling crew delays.

D.    Unavailable CMU Block and Inclement Weather (59 Days)

61. The chart reproduced above alleges that ECC suffered 59 days of excusable delay due to a shortage of concrete masonry unit (CMU) block during the 30 April to

14

1 September 2015 time period (finding 35; ex. A-16 at 57). The record concerning the CMU block is extensive but it boils down to a contention by ECC that Bahrain was experiencing a shortage of aggregate, a component of the CMU block, resulting in a shortage of the block (R4, tabs 631, 705, 712 at 3, tab 733). ECC notified the Corps of "a potential delay" due to the shortage on 23 July 2015 (R4, tab 170).

62. The government agrees that ECC experienced delays in placing the CMU block but contends that the delays were due to a lack of masons on site, a lack of qualified CMU inspectors, bad workmanship and inadequate supervision (*see* gov't br. at 29-30).

63. In its response to the show cause notice, ECC stated that it "estimated that [the CMU block] delay impacted our project by 45 days." ECC indicated that it was still performing the block work, which is presumably why it estimated the length of the delay. (R4, tab 198 at 2) As we found above, ECC did not state that its response was a claim or that it was seeking a final decision from the contracting officer, nor did it seek a sum certain. There is no other evidence that ECC ever finalized the CMU block delay and submitted a claim to the contracting officer seeking a time extension. Accordingly, we find that ECC failed to submit a claim with respect to the CMU block.

64. We believe that ECC is also asserting a delay during this time period due to inclement weather but it takes some digging to reach this conclusion. As our guidepost for this conclusion, we rely on ECC's opening brief which alleges that ECC "experienced a delay of at least 34 days due to working in the extremely hot weather." (App. br. at 52)

65. As one can see in the chart above, ECC's expert identifies a weather delay which he included in the second piling crew delay (a delay in a period earlier than the CMU block delay). In the narrative section of the report, the expert describes this as a three-day delay in November 2014 caused by high winds. (Ex. A-16 at 46-47) It does not appear, however, that this is the delay that ECC is asserting in its post-hearing brief because it referred to these delays as hot weather days and ECC distinguished between wind and hot weather days during the project.

66. While not mentioned in the chart, ECC's expert report contains a second section discussing weather delays (ex. A-16 at 57-58). The expert alleges that there were 49 days during the spring and summer of 2015 where the temperature was above the normal range. But he does not break this out as a discrete, quantifiable, delay. Rather, he treats the weather and CMU as a dual problem, concluding that "[t]he shortage of CMU Block plus the extended periods of extreme heat, negatively affected production" resulting in "an impact of 59cd to the critical path delay." (*Id.* at 58) The expert did not testify about a hot weather delay (*see* tr. 4/23-140). We find that the

15

conclusions of ECC's expert were not persuasive in convincing us that there was a significant weather delay that would entitle ECC to additional time.

67. In ECC's 9 January 2016, response to the show cause notice, ECC stated that it "believes we are owed 34 days" for the impact of hot weather during the 1 June to 30 August 2015 time period (R4, tab 198 at 2). ECC did not explain how it calculated the 34 days. (ECC also sought 11 wind and rain days (*id.* at 1).)

68. Nine days later (18 January 2016), ECC submitted a request for a time extension for both the wind and hot weather delays that covered a longer period of time, from June 2014 to January 2016, and reduced the number of days sought (R4, tabs 200, 202). In this request, ECC indicated that Kooheji (which was performing the work) sought 28 days of delay, of which ECC concluded that 20 were valid. ECC then subtracted the anticipated unusually severe weather days listed in the contract to arrive at a net delay of nine days.[3] (R4, tab 200 at 2-6) ECC did not state that it was submitting a claim or seeking a final decision.

69. CO DeMattei issued a response on 14 April 2016 in which he indicated that he considered ECC's letters to be an REA (R4, tab 211). He concluded that ECC was entitled to a time extension for three days (two in November 2014 and one in November 2015) for which ECC/Kooheji contended that there had been wind-related delay, but he denied all of the delays for heat and humidity (*id.* at 3). CO DeMattei thereafter issued Modification No. 20 (R4, tab 49), which, as described above, extended the contract completion date by three days.

70. After CO DeMattei rejected ECC's REA in part, ECC did not submit a claim to the contracting officer seeking the balance of six weather days (or any other number of days).

71. In summary, ECC has submitted, in chronological order: 1) a response to the show cause notice in which it alleged 34 hot weather days in June to August 2015; 2) an REA in which it contended that Kooheji experienced 5 or 6 hot weather days in the period of June 2014 to January 2016; 3) an expert report that combines the CMU block shortage and the hot weather for a 59-day delay in the 30 April to 1 September 2015 time period; and 4) a post-hearing brief in which it alleges at least 34 hot weather days.

72. In light of the analysis presented in ECC's REA and its expert report, we do not understand why ECC contends in its brief that it suffered at least 34 days of hot

---

[3] ECC's letter attributes five days to heat/humidity, and three to wind. One day cannot be classified because it fell in June 2015 during which ECC reports both wind and high humidity on various dates. (R4, tab 200 at 2-6)

weather delays. We find that the various numbers cannot be reconciled. Because the weight of ECC's presentation indicates that it is seeking a total of 218 days of excusable delay (app. br. at 12, 18, 52, 57, 62), as calculated by the expert, we will consider them in the same manner as the expert, that is, as a contributing factor to the CMU block delay.

73. In the alternative, to the extent that the hot weather could be viewed as a discrete delay and that ECC's submissions to the contracting officer were sufficient to constitute a claim, as discussed below, we find that there is a failure of proof for any weather delays beyond those granted by the contracting officer. No witness addressed this issue at the hearing and the record does not otherwise include proof of these delays.

E.    Modification Nos. 16, 17 and 18 (71 Days of Delay)

74. The delays discussed thus far add up to the 147 days of excusable delay indicated in the bottom line of the chart reproduced above. However, footnote 2 in that chart states that "Mods 16, 17, 18 would extend the project by 71 cd and would be excusable." (Finding 35) (The chart is inconsistent and, therefore, somewhat confusing. While the footnote alleges that these delays are excusable, in the body of the chart they are included in the non-excusable delay column.)

75. Dated 29 December 2015, unilateral Modification No. 16 revised the gravity feed to a sewage lift station (R4, tab 45). It increased the contract price by $245,595 but added no additional time (*id.* at 2-3). ECC had submitted a series of proposals for the change; in its final proposal on 29 July 2015, ECC requested $411,209 but no additional time (R4, tab 174).

76. ECC never submitted an REA seeking additional time or money related to the Modification No. 16 work, nor did it submit a claim to the contracting officer.

77. The Corps issued unilateral Modification No. 17 on 30 December 2015 (R4, tab 46). This modification changed the guest bathroom doors in the transient quarters from wood to steel but added no time or money to the contract (*id.* at 2). In its 14 October 2015 proposal for this work, ECC did not seek additional time or money (R4, tab 185).

78. ECC never submitted an REA seeking additional time or money related to the Modification No. 17 work, nor did it submit a claim to the contracting officer.

79. CO DeMattei signed unilateral Modification No. 18 on 22 January 2016 (R4, tab 47). This modification required ECC to provide exterior LED lighting fixtures in lieu of high pressure sodium (*id.* at 2). In a proposal for this work dated 9 April 2015,

ECC sought $34,194 with no additional time (R4, tab 150).  CO DeMattei issued the modification for about $300 less ($33,888) with no additional time (R4, tab 47 at 2).

80.  ECC never submitted an REA seeking additional time or money related to the Modification No. 18 work, nor did it submit a claim to the contracting officer.

81.  ECC did not state that it was entitled to a time extension for Modification Nos. 16, 17 or 18 in its response to the show cause notice (R4, tab 198).

82.  ECC did not account for the time extensions allegedly required to perform Modification Nos. 16-18 in the T62I schedule.  Thus, although its expert calculates that Modification No. 16 alone would have required 71 additional days (ex. A-16 at 62), T62I lists a one-day duration for this work (R4, tab 205 at 12 (mistakenly referring to it as Modification No. 17)).  Accordingly, if ECC's expert is correct that these modifications would have extended the completion date by 71 days, this would cast even more doubt on ECC's ability to have met a 30 November 2016 completion date.

### CPARS Evaluation

83.  During the hearing the parties presented testimony concerning USACE's post-termination preparation of a contractor performance assessment reporting system (CPARS) evaluation of ECC.  We have examined the documents cited by ECC (exs. A-11, -12, -15; exs. G-3, -5) and in particular the marginal rating for the "Management" factor, but conclude that they do not demonstrate any bias or animus on the part of the contracting officer.  Although this rating appears consistent with the record as a whole and the testimony at the hearing, we conclude that it has no bearing on the outcome of this matter.

### DECISION

The legal standards for a default termination are well established.  The Default clause of the contract provides in relevant part:

> If the Contractor refuses or fails to prosecute the work or
> any separable part, with the diligence that will insure its
> completion within the time specified in this contract
> including any extension, or fails to complete the work
> within this time, the Government may, by written notice to
> the Contractor, terminate the right to proceed with the
> work.

18

The clause provides that the contract shall not be terminated if the delay arises from unforeseeable causes beyond the control and without the fault or negligence of the contractor. The clause further provides that the rights and remedies of the government in this clause are in addition to any other rights and remedies provided by law or under the contract. (Finding 5; FAR 52.249-10(a)-(b), (d)) The government bears the burden to prove that its termination was justified. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987); *New Era Contract Sales, Inc.*, ASBCA No. 56661 *et al.*, 11-1 BCA ¶ 34,738 at 171,022.

Here, the government has met its burden of proving that ECC did not perform in a timely manner (findings 7, 9-10, 12-13, 24-28, 30). The burden shifts to ECC to show that its nonperformance was excusable. *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996).

In its post-hearing brief, ECC makes four broad arguments in support of its challenge to the default termination: 1) CO DeMattei failed to conduct the evaluation required by FAR 49.402-3(f)(4) before terminating the contract for default; 2) USACE failed to reconcile conflicting facts and information concerning ECC's completion percentage and ability to timely complete; 3) the termination was wrongful because USACE relied on irrelevant financial information as the basis to terminate; and 4) USACE's reliance on delay alone as justification for the termination is not supported by the facts or precedent.

The foundation of ECC's case is the alleged 218 days of excusable delay (if Modification Nos. 16, 17 and 18 are included). But precedent from the Court of Appeals for the Federal Circuit requires us to consider whether we possess jurisdiction to consider these contentions. After the Federal Circuit issued its decision in *Securiforce International America, L.L.C. v. United States*, 879 F.3d 1354 (Fed. Cir. 2018), we ordered the parties to submit supplemental briefs addressing the following issues: 1) whether ECC submitted a claim under the CDA to the contracting officer seeking a time extension for the delays that it contends are excusable; and 2) if not, whether the Board possesses jurisdiction to consider these defenses in light of the Federal Circuit's decisions in *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323 (Fed. Cir. 2010) and *Securiforce*.

*Maropakis* involved a contract to replace windows and the roof of a building. After it completed the work late, the contractor sent the Navy a demand for a 447-day time extension based on 5 alleged delays. The contracting officer responded that the contractor had not submitted enough information to justify the requests and rejected each of them. He invited the contractor to submit more information and cautioned that his letter was not a final decision. *Maropakis*, 609 F.3d at 1325-26.

19

The Navy later sent the contractor a demand letter in which it, among other things, informed the contractor it would owe liquidated damages due to its late completion. The contractor replied with a letter in July 2002 reiterating its earlier time extension request but specifically mentioning only one of those delays, namely, a 107-day delay due to the removal of lead contaminated windows. *Maropakis*, 609 F.3d at 1326.

In December 2002, the contracting officer issued a final decision on the government's claim for liquidated damages. The contracting officer stated that he had reviewed, among other things, the information presented by the contractor in its July 2002 letter, but concluded that it had failed to present any new information to change the Navy's position. The contracting officer assessed liquidated damages of $303,550. *See M. Maropakis Carpentry, Inc. v. United States*, 84 Fed. Cl. 182, 193 (2008).

The contractor then filed suit in the Court of Federal Claims alleging (1) breach of contract due to government delay and seeking resulting time extensions, and (2) breach of contract due to the government's assessment of liquidated damages and seeking remission of the full $303,550. The Court dismissed the contractor's claim for time extensions for lack of subject matter jurisdiction because it had not submitted a claim for a contract modification and granted the government summary judgment with respect to its counterclaim for liquidated damages. *Maropakis*, 609 F.3d at 1326-27. The contractor appealed to the Federal Circuit, which affirmed the trial court's decision.

With respect to the time extensions, the Federal Circuit observed that jurisdiction of a court or board requires both a valid claim and a contracting officer's final decision on that claim. *Maropakis*, 609 F.3d at 1327 (citing *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996)). A CDA claim need not be submitted in any particular form or use any particular wording, but "it must contain 'a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.'" *Id.* (quoting *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1997)).

Accordingly, for the tribunal to possess jurisdiction under the CDA, the contractor must submit a proper claim—a written demand that includes (1) adequate notice of the basis and amount of a claim and (2) a request for a final decision. In addition, the contractor must have received the contracting officer's final decision on that claim (or a deemed denial if the contracting officer fails to act). *Maropakis*, 609 F.3d at 1328 (citing *Ellett*, 93 F.3d at 1541-42). A claim for more than $100,000 must be certified. *Id.* at 1329.

20

The Federal Circuit, like the Court of Federal Claims, examined Maropakis's communications with the government and held that they did not meet the CDA requirements for a claim. Among other things, the Court held that the July 2002 letter was not a valid claim because "it did not provide the Contracting Officer adequate notice of the total number of days actually requested in extension, it did not state a sum certain,...it did not request a final decision" and was not certified. *Maropakis*, 609 F.3d at 1329.

Maropakis also contended that, even if it was not in technical compliance with the CDA, the contracting officer had actual knowledge of the amount and basis of its claim. The Federal Circuit rejected this, holding that there was no evidence that the contractor ever placed the government on actual notice of the specific number of days of extension that it would ultimately request. *Maropakis*, 609 F.3d at 1328-29.

Further, to the extent that the contractor could argue that the government was at least fully aware of its 107-day time extension request related to the lead contamination, the Federal Circuit rejected this on sovereign immunity grounds. *Maropakis*, 609 F.3d at 1329. The Court explained that even if the government was aware of Maropakis's contentions, there was nothing in the CDA that excused it from complying with the explicit statutory requirements. The Court held that it would "enforce[] the 'strict limits of the CDA as jurisdictional prerequisites to any appeal.'" *Id.* (citations omitted). Accordingly, the Federal Circuit upheld the trial court's dismissal of the contractor's time extension request for lack of jurisdiction.

The Federal Circuit also upheld the Court of Federal Claims' grant of summary judgment to the government on its claim for liquidated damages. Maropakis contended that there was a distinction between claims and defenses that would allow it to raise an excusable delay defense without submission of a claim. *Maropakis*, 609 F.3d at 1329-30. The Federal Circuit disagreed, holding that "a contractor seeking an adjustment of contract terms must meet the jurisdictional requirements and procedural prerequisites of the CDA, whether asserting the claim against the government as an affirmative claim or as a defense to a government action." *Id.* at 1331. Because the time extension claim was the contractor's only defense to the liquidated damages claim, the Court upheld the grant of summary judgment to the government. *Id.* at 1332.

The Federal Circuit has had several subsequent opportunities to address its holding in *Maropakis*. In *Raytheon Company v. United States*, 747 F.3d 1341 (Fed. Cir. 2014), it was the government's turn to run afoul of the rule. *Raytheon* involved a contractor claim for additional money due to pension fund adjustments under Cost Accounting Standard (CAS) 413, 48 C.F.R. § 9904.413, following the sale of three business segments. The government denied liability but contended in the alternative that it was entitled to a downward adjustment on any recovery to account

for pension contributions made on contracts before the amendment of CAS 413 in 1995. *Id.* at 1347.

When a contractor closes a segment it is required to follow the revised CAS 413, which may result in a change to the contractor's accounting practices for pre-1995 contracts. *Raytheon*, 747 F.3d at 1353-54. Under the CAS clause, FAR 52.230-2, the government is entitled to an equitable adjustment if the contractor makes a required change to its established accounting practices that results in the government owing more than it would have but for the change. *Id.; see Raytheon Co. v. United States*, 105 Fed. Cl. 236, 285-86 (2012).

Although the downward adjustment that the government sought arose from Raytheon's segment closing and involved the proper application of CAS 413, the Federal Circuit nevertheless concluded that it was outside the scope of the segment closing adjustments. The Court of Appeals explained that because the downward adjustment sought by the government was required by the CAS clause, rather than CAS 413, the government had to pursue it by way of a separate claim under the CDA subject to a written decision by the contracting officer. *Raytheon*, 747 F.3d at 1354. Because the government failed to do so, the Court of Appeals affirmed the trial court's determination that it lacked jurisdiction to consider the government's claim. *Id.* at 1354-55.

The Federal Circuit reached a different conclusion on a government defense in *Laguna Construction Company v. Carter*, 828 F.3d 1364 (Fed. Cir. 2016). In *Laguna*, after an officer of the appellant pled guilty to conspiring to defraud the United States by participating in a kickback scheme, the government moved to amend its answer in Laguna's appeal at the Board. The government contended that the fraud constituted a prior material breach that relieved the government of its obligation to pay the vouchers at issue. The Board agreed and granted the government summary judgment. *Id.* at 1367.

The Federal Circuit rejected Laguna's contention that an affirmative defense of fraud was a claim that required a decision by the contracting officer. The Court cited the definition of "claim" currently codified at FAR 2.101: "Claim means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." The Court held that "the government's defense plainly does not seek the payment of money or the adjustment or interpretation of contract terms." The Court reasoned that to hold otherwise would unnecessarily expand the definition of claim so as to bar any affirmative defense for which the contracting officer did not issue a final decision. *Laguna*, 828 F.3d at 1368.

Finally, in *Securiforce*, the Federal Circuit had the opportunity to consider *Maropakis* in the context of a termination for default. The contract at issue required delivery of fuel to eight sites. The government terminated two of the sites for convenience almost immediately and terminated the remainder for default two months later. *Securiforce*, 879 F.3d at 1358. Securiforce raised as an affirmative defense to the default termination that the government's partial termination for convenience constituted a prior material breach. Similar to *Laguna*, the Federal Circuit concluded that a defense of prior material breach need not be submitted to the contracting officer for a final decision. But the Court of Appeals also reiterated its holding in *Maropakis* that "[t]o the extent the affirmative defense seeks a change in the terms of the contract—for example, an extension of time or an equitable adjustment—it must be presented to the CO, since evaluation of the action by the CO is a necessary predicate to a judicial decision." *Id.* at 1363 (emphasis added).

Based on these decisions, it is clear that, while all possible defenses need not be submitted to a contracting officer for a final decision, a contractor contesting liquidated damages or a default termination due to excusable delay must submit a claim for a time extension before appealing to the Board. With this in mind, we examine the 218 days of excusable delay asserted by ECC.

First, we hold that we lack jurisdiction to consider the majority of these alleged delays, namely, the 9 days for late RFI responses, the 45 days due to the unavailability of the second piling crew, and the 71 days for Modification Nos. 16, 17 and 18. ECC never submitted a claim or an REA for these alleged delays and failed to mention them in its response to the show cause notice (findings 49-60, 74-82). Accordingly, consideration of these delays would be contrary to the statutory purpose of encouraging resolution of disputes at the contracting officer level and beyond the limited waiver of sovereign immunity in the CDA. *Maropakis*, 609 F.3d at 1329, 1331.

With respect to the two remaining sources of delay, 34 days for mobilization delays and the 59 days for CMU block shortages/hot weather delays, it is undisputed that the contracting officer had actual knowledge of these alleged delays and mentioned them in the default termination letter (findings 9-30). But as described above, the Federal Circuit has rejected the actual knowledge argument as a basis for our jurisdiction. *Maropakis*, 609 F.3d at 1328-29.

ECC's strongest argument concerns the 34 days for the mobilization delay because, among other things, it submitted both an REA and described these delays in its response to the show cause letter (findings 9, 44-45). The REA sought more than

23

$100,000 but was not certified, however, which is fatal to its usefulness for invoking our jurisdiction.[4] 41 U.S.C. § 7103(b)(1); *Maropakis*, 609 F.3d at 1329.

The record indicates that ECC was well aware of the distinction between an REA and claim. In its 9 January 2016 response to the show cause notice, ECC referred to CO DeMattei's rejection of the mobilization REA and promised to submit another letter concerning that delay (finding 47). ECC began preparing a request for a contracting officer's final decision for 142 days of compensable delay and more than $200,000. As we have found, ECC never submitted this claim. (*Id.*)

We conclude that ECC's mobilization delay is comparable to the *Maropakis* 107-day lead window delay. Maropakis mentioned this delay in its response to the government's demand letter but appeared to indicate that it would submit a claim. *Maropakis*, 609 F.3d at 1328. Similarly, ECC mentioned the mobilization delay in its response to the show cause letter and promised further correspondence; in fact, it began preparing a claim. ECC, like Maropakis, also referenced several other alleged delays in its correspondence with the Corps but it has provided "no evidence that the government was ever placed on actual notice of the specific number of days of extension that [it] would ultimately request" for the delays, or some subset thereof. *See id.* at 1328-29. Because ECC, like the *Maropakis* contractor, failed to submit an actual claim that clarified its demands and met the requirements of the CDA, ECC has not satisfied the jurisdictional requirements of the CDA. *Id.* at 1329.

ECC's time extension request for CMU block shortages/hot weather delays fails for similar reasons. In its response to the show cause notice, ECC stated that it was still performing the block work and "estimated" the delay to be 45 days (finding 63). Thus, ECC like the *Maropakis* contractor, ECC failed to place the Corps on notice of the specific number of days it would request even for the discrete issue of CMU block delays. *Maropakis*, 609 F.3d at 1328-29; *see J.P. Donovan Constr., Inc.*, ASBCA No. 55335, 10-2 BCA ¶ 34,509 ("approximately $65,000" is not a sum certain, thus, Board lacks jurisdiction), *aff'd, J.P. Donovan Constr., Inc. v. Mabus*, 469 F. App'x 903 (Fed. Cir. 2012). This problem is heightened by its merger in the litigation with the hot weather delays. ECC's contentions concerning the hot weather delays evolved over time (findings 64-72) and ECC never informed the contracting officer the final number of days' time extension it sought, either in isolation or in combination with the CMU block.

---

[4] While an REA may achieve the same goal as a claim, it is not the same thing. A contractor may submit an REA instead of a claim so that it can recover costs not recoverable in the prosecution of a claim. *See Bill Strong Enterprises, Inc. v. Shannon*, 49 F.3d 1541, 1549-50 (Fed. Cir. 1995), *overruled in part on other grounds Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995) (en banc).

24

In its supplemental brief, ECC contends that its various submissions to the Corps were sufficient to confer jurisdiction under the CDA. It primarily relies on three decisions. In *Blake Construction Co.*, ASBCA No. 34480 *et al.*, 88-2 BCA ¶ 20,552, ECC observes that we held that the contractor submitted a claim even though it did not specifically request a contracting officer's final decision. While this is accurate, the contractor in that appeal specifically stated the time extensions and the additional money requested, and it certified the claim. We held that in the context of the contractor's repeated demands for relief, the contractor had done enough to satisfy the claim submission requirements. *Id.* at 103,892-93, 103,895. ECC's submissions are not comparable because they lacked certifications and/or were vague as to the specific number of days ECC sought.

ECC focuses on statements by the Federal Circuit in *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995) (en banc), which concerned a "certified REA" that the contractor submitted to the contracting officer, who issued a final decision denying it and advising the contractor of its right to appeal to the Board. *Id.* at 1574. The issue in *Reflectone* was whether Board jurisdiction required there to have been a pre-existing dispute when the contractor submitted its claim, as that term is defined in the FAR. In holding that there was no such requirement, the Court of Appeals observed how inefficient it would be for the Board to dismiss an appeal such as that at issue and require the contractor to re-submit the same claim to the contracting officer, starting the whole process over. *Id.* at 1581.

*Reflectone* is largely inapposite to the present matter due to the focus in that appeal on whether a pre-existing dispute requirement should be read into the CDA/FAR. We agree with ECC to the limited extent that, when it has already submitted an REA on the mobilization issue, there would be a certain amount of inefficiency if it had to go back and certify and re-submit its claim to the contracting officer, but that is the path that ECC chose by neglecting to submit the claim it began preparing (finding 47). However, as the Federal Circuit explained in *Maropakis*, that is what the limited waiver of sovereign immunity in the CDA requires. *Maropakis*, 609 F.3d at 1328-29.

ECC also cites our decision in *L-3 Communications Integrated Systems, L.P.*, ASBCA Nos. 60713, 60716, 17-1 BCA ¶ 36,865, in which, according to ECC, the Board "reiterated the low threshold for claim submissions in considering jurisdiction" (app. supp. br. at 9). *L-3* does not speak to the issues in this appeal. That appeal involved contracting officers' final decisions that asserted government claims. We found that each final decision stated a sum certain and a basis for the claim. We rejected the contractor's contention that the contracting officer was required to set out each cost element that made up the claim and the reason that each was unallowable. *L-3*, 17-1 BCA ¶ 36,865 at 179,624. We agree with ECC to the extent that the claim submission requirements are fairly limited as the Federal Circuit explained in

25

*Maropakis*, but the contractor still must comply with them. As we have detailed, ECC never brought the majority of its delay issues to the attention of the contracting officer, it failed to certify the mobilization delay issue, and never finalized a specific delay for the CMU block/hot weather issue. There is nothing comparable in *L-3*.[5]

With this issue resolved, we observe that in its supplemental brief ECC requests that if we determine that we lack jurisdiction to consider its delay claims that we stay the appeal so that it can submit a claim to the contracting officer. Assuming the contracting officer denies it, ECC could then file an appeal which could be consolidated with the present matter (app. supp. br. at 2). We decline this request both because of its lateness and, based on our decision below, we believe it is unlikely that a time extension request covering only a fraction of the time needed to complete would have any effect on the outcome. *Empire Energy Management Systems, Inc. v. Roche*, 362 F.3d 1343, 1351-52 (Fed. Cir. 2004).

We now turn to ECC's four contentions.

1.    The Contracting Officer Made the Evaluation Required by
      FAR 49.402-3(f)(4)

ECC contends that CO DeMattei's termination decision was arbitrary and capricious because he failed to perform the analysis required by FAR 49.402-3(f)(4). FAR 49.402-3(f) identifies seven factors that the contracting officer shall consider in determining whether to terminate a contract for default. These factors include: "The urgency of the need for the supplies or services and the period of time required to obtain them from other sources, as compared with the time delivery could be obtained from the delinquent contractor." FAR 49.402-3(f)(4). ECC contends that CO DeMattei failed to comply with this factor because he did not make a meaningful comparison of the time ECC and a replacement contractor would require to finish (app. br. at 34-37).

The factors in FAR 49.402-3(f) are not prerequisites to a valid termination. *DCX*, 79 F.3d at 135. Although compliance or noncompliance with the regulation may aid the Board in determining whether a contracting officer abused his discretion, the regulation does not confer rights on the defaulted contractor. *Id.* A contracting officer's failure to consider one of the factors in FAR 49.402-3(f) does not require that a default termination be converted to one for the convenience of the government. *Id.*

---

[5] In a similar vein, ECC cites *Marshall Construction, Ltd.*, ASBCA Nos. 37014, 39361, 90-1 BCA ¶ 22,597, in which we found the claim to be "a bare bones affair" but was sufficient because it sought as a matter of right a sum certain (in an amount not requiring certification).

We conclude that CO DeMattei properly considered the factors in FAR 49.402-3(f) (findings 28-29). In terms of making a valid comparison between ECC's time to finish and that of a replacement contractor, it seems to us that an accurate schedule from ECC would be a necessary prerequisite for making such a comparison. In the months leading up to the termination, CO DeMattei provided ECC ample opportunity to provide the Corps with a realistic schedule (findings 8-17).

In his termination memorandum, CO DeMattei indicated that he had lost faith in ECC's ability to provide accurate schedules (finding 28). From reviewing the record, this is understandable. When ECC responded to the show cause notice on 9 January 2016, it represented that it had completed 51.94% of the work (finding 9). Effectively, this meant that over a two-year period, for each day it worked ECC had made about a half-day of progress. Despite completing just 51.94% in 24 months, ECC attached a schedule to its show cause response that predicted it would complete the project in less than 8 months (findings 10, 24). As we have found, ECC soon pushed back the completion date another 3 months and then failed to keep pace with this schedule (findings 12, 24). And this was not the first large scale schedule slippage that ECC had reported on task order 6 (finding 11). We conclude that CO DeMattei had substantial reasons to be skeptical about ECC's ability to finish the project by the end of November 2016.

We further conclude that CO DeMattei acted within his discretion in considering ECC's progress on the adjacent P937 project, for which he was also the contracting officer. As we have found, the projects had several comparable features, including the location, contract amount, subcontractors, delivery method, and type of facility. (Finding 18) While past is not always prologue, when CO DeMattei was making his termination decision we do not see how he could have ignored that ECC was 15 months past the P937 completion date, with months of work remaining before it could deliver beneficial occupancy (finding 20). Nor do we believe that he could have ignored that when the contract completion date for task order 6 passed ECC had completed an even lower percentage of work than it had completed on the P937 finish date (findings 9, 19).

While it is true that Vertex was still working on the project at issue in July 2017 (and if the representations of ECC's counsel in its post-hearing briefs are correct, it did not meet the August 2017 completion date), we do not believe that determining whether the contracting officer abused his discretion turns on how accurately he predicted the future. The period of time it took the Corps to negotiate with the surety (and for the surety to negotiate with ECC's subcontractors), was not fully in the control of CO DeMattei (finding 32). It is simply impossible to know whether ECC would have completed the project more quickly than Vertex given all the variables, such as the change from a transient quarters to a bachelor's enlisted quarters or that, but for the

27

termination, ECC would have had to continue building two projects at the same time, which had played some role in the delays (findings 19, 34).

ECC cites our decisions in *L&H Construction Co.*, ASBCA No. 43833, 97-1 BCA ¶ 28,766 and *S.T. Research Corporation*, ASBCA No. 39600, 92-2 BCA ¶ 24,838, as support for its contention that CO DeMattei failed to consider properly the relative completion times of ECC and its replacement. In *L&H Construction*, we sustained a challenge to a default termination where the contracting officer relied on materially erroneous information as to the appellant's culpability for the delay and materially erroneous information as to the labor and time to complete the work. *L&H Construction*, 97-1 BCA ¶ 28,766 at 143,556. As to the former point, we have held that we lack jurisdiction to consider ECC's excusable delay contentions because ECC never submitted a claim for a time extension. Thus, when he terminated the contract, CO DeMattei properly concluded that ECC failed to complete the project on time.

As for the labor and time to complete, ECC has not proven that the contracting officer relied upon erroneous information. According to ECC's expert, at the time of termination (four months past the completion date) ECC had completed 64% of the work[6] (ex. A-7 at 8). By any measure, a great deal of work remained on the project and we do not see any evidence that CO DeMattei misunderstood the effort required to complete the project. Given that ECC was promising to complete the project in a little over seven months, it appears that he had a better grasp on the time it would take to complete than ECC.

In *S.T. Research*, we upheld a challenge to a default termination where the contracting officer apparently did not consider FAR 49.402-3(f) at all, and did not inquire about whether another contractor could complete the work until after termination. *S.T. Research*, 92-2 BCA ¶ 24,838 at 123,926, 123,928. ECC has not made any comparable allegation here. *S.T. Research* does not speak to an appeal where the contracting officer considered the appropriate factors.

We reject ECC's contention that the termination was an abuse of discretion based on an improper evaluation of the FAR 49.402-3(f) factors.[7]

---

[6] The government contends that ECC was "at most, 58 percent complete" (gov't br. at 48) but given our determination it is not necessary for us to resolve this.

[7] ECC also relies upon the decision of the General Services Board of Contract Appeals in *American Sheet Metal Corporation v. General Services Administration*, GSBCA No. 14066 *et al.*, 99-1 BCA ¶ 30,329, but that appeal involved a failure to make progress termination where the GSBCA found that the contracting officer's method of measuring the appellant's progress was incomplete and

28

2. The Contracting Officer Reasonably Considered the Record Before Termination

ECC contends that CO DeMattei failed to reconcile conflicting facts and information regarding ECC's completion percentage and its ability to "timely complete" (app. br. at 38). ECC makes two broad arguments. First, it contends that the termination was an abuse of discretion because it was based on inaccurate data in the show cause notice and the termination decision. Second, it contends that the termination was an abuse of discretion because CO DeMattei did not meaningfully consider the achievability of schedule T62I.

Inaccurate Data

ECC directs us to the following statement in the 30 December 2015 show cause notice: "As of Progress Payment Request No. 14, approved 22 November 2015, ECC is 37 percent complete" (R4, tab 197 at 1). ECC's complaint is not that this statement was inaccurate but that this payment request was for the period ending 30 September 2015 and that ECC had completed additional work over the three months that followed (app. br. at 39). But as we have found, this was the most recent pay request at the time CO DeMattei issued the show cause notice and he considered ECC's progress during the interim by reviewing daily reports and talking to USACE personnel at the project (finding 7).

ECC cites pay requests 15 and 16 in support of its contention that it had completed additional work in the months leading up to the show cause notice (app. br. at 39). But the record indicates that the Corps did not receive these pay requests until 18 January 2016 and 4 February 2016, respectively (R4, tabs 228-29). It would seem rather unfair to fault a contracting officer for failing to consider documents not yet submitted.[8]

Moreover, even if CO DeMattei could have calculated a more up-to-date completion percentage, the error was harmless based on ECC's response to the show cause notice. As we have already discussed, that response indicated that ECC had

---

far different from one in which the contractor was months past the completion date at termination.

[8] ECC contends in its brief (at 11) that a draft of pay request 15 was available to the contracting officer by 22 December 2015 and that it showed 45% completion as of 30 November 2015. While ECC does not cite any evidence of this (other than the final version stamped received on 18 January 2016), we do not believe CO DeMattei would have been swayed by 45% completion less than two weeks before the completion date.

29

used up the entire time for performance while completing just over half the work. Thus, it is not clear what ECC's ultimate point is. Surely it is not contending that the contracting officer would not, or should not, have issued a show cause notice if he had known ECC had completed less than 52% of the work at the expiration of the contract term. To the contrary, CO DeMattei would have been neglecting his duties if he had let the contract completion date pass by without taking any action.

ECC makes a similar argument concerning the following statement in the termination for default letter: "As of today's date, ECC is 124 days past the contract completion date, and as of Progress Payment Request No. 17 [for the period ending 29 February 2016 (R4, tab 230)], approved 23 March 2016, the project is far from completion, only 56 percent complete" (R4, tab 2 at 6). ECC complains that the quoted language does not take into account that ECC made progress in March and April (app. br. at 40). But once again the Corps did not receive this pay request until 18 March 2016 and it was the most recent at the time of termination (R4, tab 230). CO DeMattei kept himself up to date on ECC's progress during this period. His observations of ECC during this time period reinforced the notion that it could not meet its schedules because "the placement that was required...was not met during that time period, just like the recovery schedule before that, the recovery schedule before that, the baseline, and any other schedule that was submitted." (Finding 25)

The most salient point with respect to ECC's performance during this period is that even its own expert agreed that it did not make the progress required in the T62I schedule (findings 24, 26). Thus, if in the termination letter CO DeMattei had specifically discussed ECC's progress in March and April, he would have stated that it continued to fall behind schedule, which clearly would not have been helpful to ECC.

Consideration of Schedule T62I

ECC next contends that CO DeMattei failed to reconcile conflicting information concerning the achievability of the T62I schedule. It contends that he should have concluded that ECC would complete the project by the 30 November 2016 completion date in that schedule (app. br. at 41-44).

Before we address these issues, we consider whether CO DeMattei even had to analyze whether the T62I schedule was achievable. In our view, ECC's assertion that it could have completed the project by 30 November 2016–350 days after the contract completion date–is hardly something that works to its benefit. CO DeMattei could have terminated the contract without considering T62I because, as we have found, the contract provided that the contracting officer could terminate the contract if ECC failed to complete the work on time. The Federal Circuit has upheld a comparable termination even though the contractor succeeded at trial in proving some excusable

delay when that excusable delay was not enough to extend the contract date to the projected completion date. *Empire Energy*, 362 F.3d 1343.[9]

Nevertheless, CO DeMattei did consider the T62I schedule. Assuming for the moment that he was required to do so, we will examine whether he acted within his discretion. As we have found, he tasked a USACE scheduling professional, Ramon Sundquist, with reviewing that schedule. Mr. Sundquist gave the schedule what could be called a mixed review. While declining to recommend approval, he concluded that with subcontractor buy-in, appropriate manpower and sufficient material deliveries, the schedule was achievable. But he did not verify that ECC had achieved, or was in the process of achieving, these predicates for timely completion. (Finding 16) In our view, a fair reading of Mr. Sundquist's memo is that, if ECC did everything right in managing the project going forward, it could meet a 30 November 2016 completion date. However, even Mr. Sundquist did not believe that ECC would do everything right after more than two years of struggling (*id.*).

CO DeMattei considered Mr. Sundquist's analysis as well as ECC's performance to date on task order 6 and P937. He also allowed ECC to perform for a period of time under the T62I schedule but ECC did not meet its projections for March and April. Based on these considerations, he concluded that the 30 November 2016 completion date was not credible. (Findings 17, 25)

The Federal Circuit has held that "although a contracting officer has discretion with respect to contract termination, a termination for default will be set aside if it is arbitrary or capricious, or constitutes an abuse of the contracting officer's discretion." *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999) (citing *Darwin Construction Co. v. United States*, 811 F.2d 593, 598 (Fed. Cir. 1987)). Further, the Court of Appeals held in *McDonnell Douglas* that "[w]hen there is no nexus between the decision to terminate for default and contract performance, as was true in *Darwin*, [*Schlesinger v. United States*, 390 F.2d 702 (Cl. Ct. 1968)], and [*John A. Johnson Contracting Corp. v. United States*, 132 F. Supp. 698, 704-05 (Ct. Cl. 1955)], the termination for default may be arbitrary and capricious and set aside in favor of a termination for convenience." *Id.*

---

[9] In *Empire Energy*, the Federal Circuit upheld a default termination where the contractor alleged 106 days of delay but would have needed 154 days to complete. As the Court held, "Empire still would have had nearly fifty days of unexcusable delay, justifying the Air Force's termination." *Empire Energy*, 362 F.3d at 1351-52. So too here. Even if we had jurisdiction to consider ECC's excusable delays, they would only have pushed the contract completion date to 9 July 2016 (app. br. at 18), which would be more than four months short of its purported 30 November 2016 completion date.

The record demonstrates that CO DeMattei did not rush into his termination decision but rather went through a process in which he considered ECC's response to the show cause notice, then worked with ECC on the submission of an achievable schedule while also considering the views of an internal USACE scheduling expert and ECC's overall performance on both projects. The great weight of the evidence indicates that there were substantial reasons to doubt that ECC would complete the project by 30 November 2016. It is clear from the record that CO DeMattei's decision was the product of reasoned decision-making and that there was a nexus between the facts and his ultimate decision. We do not believe ECC was owed anything more under controlling precedent.[10]

### 3. The Contracting Officer did Not Rely on Irrelevant Financial Information as the Basis to Terminate

In its brief, ECC presents a short argument in which it contends that the termination was arbitrary and capricious because CO DeMattei "relied on irrelevant financial information as the basis to terminate" (app. br. at 45). But this is not accurate. While CO DeMattei's final decision referred to ECC's "grave financial condition" he cited as the reason for the termination ECC's failure to complete the work on time (finding 30).

While it is undisputed that ECC had to rely on its surety for financial assistance because it could not pay its subcontractors (*see, e.g.*, app. br. at 8), the precise contours of ECC's financial troubles are in dispute. In its brief, ECC contends that the financial issues had been resolved, which, in its view, demonstrates that the contracting officer "was in search of excuses to terminate ECC" (*id.* at 45-46).

We do not see how this argument can change anything. As we have seen, at termination, ECC had missed the completion date badly and had not submitted a claim for a time extension. CO DeMattei did not need to "search" for a reason to terminate because there was a very apparent one and the government needs only one basis for a default termination. *Quality Trust Inc.*, ASBCA No. 59983, 16-1 BCA ¶ 36,368. There was no additional obligation that required CO DeMattei to determine how

---

[10] ECC also relies on *Jamco Constructors, Inc.*, VABCA Nos. 3271, 3516T, 94-1 BCA ¶ 26,405. In those appeals, the VABCA held that a contracting officer failed to properly consider FAR 49.402-3(f)(4), because he failed to analyze the relative completion times of the contractor and its replacement. *Id.* at 131,362. *Jamco* is distinguishable because we have found CO DeMattei's inquiry to be reasonable under the circumstances. Moreover, VABCA precedent is not binding on us.

ECC's financial condition impacted its performance as compared to other factors such as its management.[11]

### 4. USACE's Reliance on Delay for Termination

In what is the longest argument in its brief, ECC makes three contentions: 1) unexcused delay alone is not sufficient to support termination (app. br. at 47-48); 2) that it suffered delays related to mobilization and other issues (*id.* at 48-52); and 3) that the analysis of its expert is superior to that of the government's expert (*id.* at 52-63).

First, ECC contends that delay alone is not sufficient to terminate the contract. Rather, it contends, "[t]he more standard remedy for delay is through the assessment of liquidated damages" (app. br. at 47). This is incorrect because a failure to perform on time is a basis for termination. *DCX*, 79 F.3d at 134.

Default termination and the assessment of liquidated damages are not an either/or proposition. As we stated above, the Default clause specifically provides that the government's rights and remedies under the clause are in addition to any other rights and remedies it has under the contract or by law. FAR 52.249-10(c). One of those other rights is contained in the Liquidated Damages clause (finding 5), which specifically grants the government the authority to continue the assessment of liquidated damages post-termination until the work is completed. FAR 52.211-12(b). Thus, in *Empire Energy*, the contracting officer assessed liquidated damages and terminated the contract for default. *Empire Energy Management Systems, Inc.*, ASBCA No. 46741, 03-1 BCA ¶ 32,079 at 158,547, 158,563; *see Empire Energy*, 362 F.3d at 1354 (citing *Fla. Dep't of Ins. v. United States*, 81 F.3d 1093, 1097 (Fed. Cir. 1996); *Olson Plumbing & Heating Co. v. United States*, 602 F.2d 950, 955 (Ct. Cl. 1979)).

ECC next contends that mobilization delays, a CMU block shortage, and hot weather delayed its performance. We have held that we lack jurisdiction to consider these delays.

Finally, ECC concludes with a long section discussing the relative merits of its expert's report compared to that of the government. We have obviated the need to resolve this by considering this appeal based on the conclusions in the report of ECC's expert.

---

[11] ECC also implies that the Corps caused the financial difficulties and delayed the project by interfering with ECC's subcontractor, Kooheji. As with the other alleged delays, ECC has not submitted a claim for a time extension.

33

Because we conclude that the contracting officer acted reasonably in terminating the contract for failure to complete on time, we will not address USACE's contention that the termination was justified based on ECC's allegedly false certifications that it was paying Kooheji when, according to the Corps, it was not.

<u>CONCLUSION</u>

For the foregoing reasons, we deny the appeal.

Dated: September 4, 2018

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60647, Appeal of ECC CENTCOM Constructors, LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

34